NORTHERN LIGHTS MOTEL,
INC., Appellant,

v.

Avonna SWEANEY, as personal repre-
sentative of Kenneth G. Stumbaugh,
Deceased, Appellee.

No. 2476.

Supreme Court of Alaska.

Feb. 25, 1977.

Rehearing Denied May 6, 1977.
See 563 P.2d 256.

Peter A. Galbraith and Murphy L. Clark, Anchorage, for appellant.

Joseph L. Young and W. Michael Moody, Atkinson, Conway, Young, Bell & Gagnon, Inc., Anchorage, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

CONNOR, Justice.

In the early morning hours of September 19, 1972, Kenneth Stumbaugh died in a fire while staying at the Northern Lights Motel in Anchorage, Alaska. His personal representative sued the motel and was awarded a total judgment of $313,650.82 after a trial by jury. Northern Lights Motel, Inc., appeals from the judgment on a variety of grounds. The central issues on appeal concern the application of the doctrine of negligence *per se.*

The fire started in a chair in room 15 and spread to room 10 where Stumbaugh was staying. It was not determined at trial whether it was caused by a lighted cigarette left in the chair by the room occupants or whether it was deliberately set by an arsonist.[1]

---

1. Robert Timlin, an expert who investigated the fire for the defendant's insurance carrier, concluded in his report that a burglar must have set the fire. He ruled out careless smoking because one occupant of the room (Cutting) and his date left at 8:30 P.M., and the room was empty from then until the time the fire started. The fire alarm did not sound until 2:56 A.M. Cutting left some $700 or $800 in his top dresser drawer. Cutting's date may have made a telephone call from a bar during the evening, after she saw the money when Cutting paid her

The fire was discovered by two men, Magnuson and Nyquist, while they were driving along Fireweed Lane. After learning from the deceased's roommate that Stumbaugh was still in his room, Magnuson attempted a rescue. He entered the smoke-filled room, located Stumbaugh, and tried to drag him out, feet first. Stumbaugh struggled and kicked, grabbing a table and chair to prevent being pulled. As Magnuson reached the door and breathed some fresh air, Stumbaugh kicked loose and moved back into the room. At about that time, "whatever it was that was smoldering in there burst into flames," and Magnuson was prevented from going back into the room. After several unsuccessful attempts to put out the flames, he and Nyquist went on to get the rest of the occupants out of the building. Stumbaugh died from carbon monoxide asphyxia, according to the autopsy report.

The Northern Lights Motel was originally used as an apartment building. It was not converted into a motel until 1970. It was built in two wings, in 1964 and 1966 respectively, by Jack Cox and his employee Tony Rayhoe. Mr. Cox and his wife owned the property as tenants by the entirety. After Mr. Cox's death on July 4, 1968, the property passed to Mrs. Cox by operation of law. On July 1, 1970, Mrs. Cox transferred the property to Northern Lights Motel, Inc., of which she is the sole shareholder.

After the 1966 addition was built the second floor of the motel had approximately 3,300 square feet of floor area. The cost of the 1966 (east-west) wing was at least equal to the cost of the 1964 (north-south) wing, and possibly more.

The motel was largely constructed of three-eighths to one-half inch plasterboard or sheetrock. The thickness of plasterboard required for one-hour fire-resistant construction is five-eighths inch. In addition, there was testimony that the ceiling of the east-west wing (in which the fire started) was only constructed of fiberboard ("bat boards") instead of plasterboard. The ceiling of the north-south wing, in which Stumbaugh's room was located, was of ½ inch sheetrock. In at least one wing the wall terminations separating the apartment ceilings did not extend fully into the ceiling. As a result the fire burned along the ceiling and around the walls into adjoining rooms.[2] Proper plasterboard ceilings might have cured this deficiency.

The Northern Lights Motel was inspected by the borough fire department twice before the fire. Various deficiencies were noted, including a need to enclose the furnace room in one-hour construction, and these were promptly remedied by the management. The inspector failed to note the construction of the east-west wing, although his report indicated the north-south ceiling construction. The borough department did not consider the building to be a threat to human life. Borough Fire Chief Hildreth did testify, however, that had he known of the ceiling construction in the east-west wing he would have required additional safety devices. In 1970 the department considered the building to be an "existing building" under the state fire code, including the Uniform Building Code. The department permitted such buildings to continue operating without one-hour construction or alternative safeguards such as sprinkler systems or smoke detectors, as long as the department determined that they presented no unreasonable threat to human life.

After the close of evidence and argument by counsel, the jury was given the following instructions, among others:

$100. A 16-year-old boy was found stealing the belongings of motel occupants during the fire.

2. According to one expert witness, Degenkolb, the fire spread in this manner. Another expert witness, Chief Hildreth of the Borough Fire Department, while of the opinion that the fire spread from within the building to the outside, did testify that the external false mansard roof burned at the same time as did the interior. He testified that in his opinion one-hour construction would only have delayed the fire ten to fifteen minutes, and that it then would have spread at the same speed.

"INSTRUCTION No. 21

You are instructed that the Alaska Administrative Code in effect at the time the second wing was added to the Northern Lights Motel required compliance with certain requirements of the 1955 edition of the Uniform Building Code. The requirements of said code, as they concern this case, read as follows:

> Sec. 1301 Group H occupancies shall be: Hotels, apartment houses, dormitories, lodging houses
>
> Sec. 1302(b) Group H occupancies— having more than three thousand square feet (3000 sq ft) of floor area above the first floor shall be of not less than one-hour fire-resistive construction throughout."

"INSTRUCTION No. 22

If you find from a preponderance of the evidence that the defendant violated any of the provisions of the law just read to you and that any such violation legally caused the accident in question, you are instructed that the party who has proven this has established a prima facie case that the other party was negligent. This prima facie case of negligence is not conclusive. It may be overcome by the evidence showing that under all the circumstances surrounding the event in question that that party's conduct was excusable or justifiable.

To show that a violation of law was excusable or justifiable, so as to overcome this prima facie case of negligence, in the event you find the defendant violated any of the foregoing provisions of law, such party must convince you, the jury, that any such violation of law resulted from causes or things beyond the control of such party and that he was not negligent.

If, in accordance with these instructions, you find that the defendant has violated the law and that any such violation legally caused the accident in question, and you further find that defendant has failed to so excuse or justify such violation of law, then you must find that the defendant was negligent."

Defendant asserts that these instructions were erroneous on a number of grounds. Since the heart of plaintiff's case concerned negligence *per se* and the Uniform Building Code, any error would require reversal.

## I.

### Incorporation of the Uniform Building Code in Alaska Law

13 AAC § 50.020(a) (1971), in effect at the time of the fire, provided:

> "Codes and standards contained in U.B.C. Volumes 1 through 4, AIA Article 11, and NFPA Volume 4 are adopted to regulate area, height, fire resistive construction, maintenance, and number, size, type, location and marking of exits for all occupancies."

13 AAC § 02.400(b) (1959), effective during the period in which the motel was built, provided:

> "Compliance with the 1955 Edition of the Uniform Building Code of the Pacific Coast Building Officials Conference and all future amendments thereto shall be minimum requirements for height, fire resistant construction, installed fire extinguishing and fire alarm systems, number, size, type and arrangements of exits for all . . . roadhouses, hotels, motor courts, . . . or similar places of assemblage of any capacity."

Defendant contends that 13 AAC § 2.400(b), the predecessor to 13 AAC § 50.-020(a), is ineffective for two reasons: (a) the reference to future amendments is an unconstitutional delegation of power to a private, nongovernmental organization, and hence invalidates the entire section; and (b) the Administrative Code did not and does not provide the public with any information on how to obtain copies of the 1955 Uniform Building Code (U.B.C.), or its amendments, and hence is invalid. If the U.B.C. was not properly incorporated into the regulations, defendant contends, it should not have been used to provide a negligence *per se* standard.

Defendant argues that it was not permissible to adopt the U.B.C. with "all future amendments thereto" as 13 AAC

§ 02.400(b) purported to do because this in effect delegates the future lawmaking power of the state to a private organization, the Pacific Coast (now International) Building Officials Conference,[3] in violation of the constitutional doctrine of nondelegation to private parties.[4]

One reason for the prohibition against delegation to private groups is that when amendments are adopted by these groups the public does not necessarily receive notice of, or have an opportunity to comment on or criticize the amendments, as it does when they are adopted by the legislature or promulgated under the Alaska Administrative Procedure Act. *See* AS 44.62.190; AS 44.62.210(a); *Agnew v. Culver City,* 147 Cal. App.2d 144, 304 P.2d 788, 796 (1956).[5] While the adoption of future amendments has been upheld in certain cases,[6] we recognize that the due process problem is a serious one.[7]

This does not mean that the jury instructions based on the Uniform Building Code were necessarily invalid. It is undisputed that the only difference in language between the 1955 and 1970 editions of the Code in the relevant sections was that the words "first floor" were changed to "first story" in § 1302(b).

■ We affirm the trial court's holding that the future amendments clause of the regulation is separable from the rest of the administrative regulation, leaving the 1955 U.B.C. provisions applicable. Because there was no significant change in the U.B.C. provisions as they pertain to this case, it follows that the trial court properly instructed the jury on this issue. This also means that we need not determine the constitutional questions presented.

■ Defendant also argues that the failure to specify in the regulation where cop-

---

**3.** Adopting a code written by a private national organization generally does not raise delegation of authority problems as long as the code, organization and edition are clearly specified, and no attempt is made to adopt future amendments. Richardson, *Building Codes: Reducing Diversity and Facilitating the Amending Process,* 1A Sutherland, Statutes and Statutory Construction 549, 555 (4th ed. Sands 1972).

**4.** The non-delegation doctrine is virtually dead in the federal courts. K. Davis, Administrative Law Treatise § 2.17, at 77 (Supp.1970). State courts, however, adhere to this doctrine, although not uniformly. *Compare, e. g., People v. Barksdale,* 8 Cal.3d 320, 105 Cal.Rptr. 1, 503 P.2d 257, 269–70 (1972), *with Blumenthal v. Board of Medical Examiners,* 57 Cal.2d 228, 18 Cal.Rptr. 501, 368 P.2d 101 (1962) (Traynor, J.). See other cases discussed in K. Davis, Administrative Law Treatise, §§ 2.11, 2.14–2.17 (1958 & Supp.1970).

**5.** Both the majority and concurring opinions in *Area Dispatch, Inc. v. City of Anchorage,* 544 P.2d 1024, 1026 n. 10, 1027 n. 5 (Alaska 1976), reserved the question of the constitutionality of adopting future amendments. However, in *Kingery v. Chapple,* 504 P.2d 831, 836–37 & n. 13 (Alaska 1972), we upheld a regulation which incorporated the motorcycle helmet and facewear quality standards of the United States Standards Institute Safety Code, but indicated that had the Institute been empowered to adopt standards in the future, the provisions would have been invalid.

**6.** For example, in *United States v. Sharpnack,* 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958), the Supreme Court upheld the 1948 Federal Assimilative Crimes Act, adopting for federal enclaves all criminal laws of the adjoining states, including those to be passed after 1948. The court found a conscious congressional policy to make the criminal law of the enclave conform to that of the adjoining state, and noted that Congress could exclude a new state law if it disapproved of it. *Id.* at 294, 78 S.Ct. 291. *See generally* Liebmann, "Delegation to Private Parties in American Constitutional Law," 50 Ind.L.J. 650 (1975); Hayes, "Effect of Changes in Legislation Incorporated by Reference," 43 Minn.L.Rev. 89 (1958).

**7.** Since 1969, administrative agencies have been required to conform their administrative regulations to the drafting manual prepared by the Legislative Affairs Agency. AS 44.62.-060(a). The manual states:

"Under presently controlling court decisions, an agency may *not* adopt by reference a code or set of standards from another state, the federal government, or a private organization *and provide that future amendments as they become effective are being adopted also.* Of course, when a particular code or set of standards is changed, an agency may adopt the amended version." (Emphasis in original). Legislative Affairs Agency, Drafting Manual for Administrative Regulations at 12–13 (4th ed. 1971).

ies of the 1955 Uniform Building Code can be obtained invalidates the regulation. An administrative agency must give notice to the public when it proposes to adopt regulations. AS 44.62.190. It must deliver a copy of its regulation to the lieutenant governor to be filed. AS 44.62.040. The lieutenant governor is then required to publish all filed regulations in the Alaska Administrative Code, except that he may print "appropriate references to any regulations the printing of which he finds to be impractical, such as detailed schedules or forms otherwise available to the public . . . ." AS 44.-62.130(a). Our administrative procedure act does not require that a clause be inserted in each regulation stating where a text incorporated by reference can be found. This appears to be unnecessary, since by law a copy of the text must be available at the lieutenant governor's office. AS 44.62.-080(2). Defendant does not assert that the 1955 Uniform Building Code was not filed with the secretary of state (predecessor of the lieutenant governor), and there is no evidence on that question in the record. We conclude that in this respect the building code was validly adopted.

### The Grandfather Clauses

Defendant argues that grandfather clauses in the Alaska regulations and the U.B.C. exempt the Northern Lights Motel from compliance. The clauses in the regulations provided:

> *13 AAC § 02.403: (Effective 1959 to 1969)*
>
> "The provisions of this code shall apply equally to new and existing conditions except that existing conditions not in strict compliance with the terms of this code shall be permitted to continue where the exceptions do not constitute a distinct hazard to life or adjoining property."
>
> *13 AAC § 55.030(a). Application. (Effective in 1972)*
>
> "(a) Chs. 50–55 of this title apply equally to new and existing conditions except that existing conditions not in strict compliance with the terms of those chapters are permitted to continue where the ex-

ceptions do not constitute a distinct hazard to life and property in the opinion of the State Fire Marshal."

The U.B.C. grandfather clause, which was not changed throughout this period, provides:

> *Uniform Building Code § 104(g). Existing Occupancy.*
>
> "Buildings in existence at the time of the passage of this Code may have their existing use or occupancy continued, if such use or occupancy was legal at the time of the passage of this Code, provided such continued use is not dangerous to life."

The condition of the Northern Lights Motel was a subject of dispute in the trial court. The borough fire department, after inspection, was of the opinion that the building was not a threat to human life. Those inspections were carried out using an "existing building" standard under the state fire code. However, the inspections did not reveal all of the defects in the ceiling construction, and Chief Hildreth testified that had he known of these additional defects, he would have required that safety measures be taken.

In the circumstances of this case, the grandfather clause in the U.B.C. is of no help to defendant. The motel was built in 1964 and 1966, and the regulation adopting the Uniform Building Code had been effective since at least 1959. However, the grandfather clauses contained in the regulations are more troublesome. The first difficulty is to determine whether the term "existing condition" refers to one existing at the time of inspection, or one existing at the time of the adoption of the code. We view this provision as an attempt to give the fire marshal some discretion in dealing with code violations in structures not currently under construction. Hence, once a building is built, its condition becomes "existing." The fire marshal can negotiate with the owner as to the best way to remedy minor defects, without being required to close the building to the public every time defects are discovered.

Since plaintiff's theory was that the defendant corporation which was not in existence when the building was *built*, negligently operated the *existing* motel, the grandfather clause applicable in 1972 is the one of relevance. It provided that existing conditions might continue where they

"do not constitute a distinct hazard to life and property in the opinion of the State Fire Marshal." 13 AAC § 55.030(a).

This places a burden on defendants to show that the state authorities expressly or impliedly accepted the condition of the building. We find no evidence, however, that any state officials inspected the building or issued any opinions, express or implied, that the conditions were not unduly hazardous. It is true that the borough department, based on faulty information received in its inspections, gave the building a "clean bill of health," but since it had not been delegated the authority by the state to do so[8] this does not satisfy the regulation. *Cf. People v. Settles*, 29 Cal.App.2d Supp. 781, 78 P.2d 274, 276 (App. Dep't 1938). *But see Del Pino v. Gualtieri*, 265 Cal.App.2d 912, 71 Cal.Rptr. 716, 720 (1968) (refusing to apply negligence *per se* to an existing building under the U.B.C. in the absence of evidence that the building was inspected and found unsafe).

■ In conclusion, we hold that defendant was not exempted by any grandfather clause under the U.B.C. or the regulations. Thus the court did not err in instructing the jury that defendant was required to comply with the specific provisions of the U.B.C.

*Uniform Building Code Standard as Negligence Per Se*

In *Ferrell v. Baxter*, 484 P.2d 250, 263 (Alaska 1971), we adopted the principles expressed in the Restatement (Second) of Torts concerning negligence *per se:*[9]

"The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results." Restatement (Second) of Torts § 286 (1965).

■ Where these criteria are met, the trial court may, in its discretion, adopt the statute or regulation in question rather than the usual common law reasonable person standard as the applicable standard of care. *Bachner v. Rich*, 554 P.2d 430, 440–41 (Alaska 1976). *See Morris v. Soldotna*, 553 P.2d 474, 477 (Alaska 1976). Substitution of an administrative or legislative enactment as the applicable standard of care is appropriate where the rule of conduct contained therein is expressed in specific, concrete terms. Substitution is not appropriate where the statute merely sets out a general or abstract standard of care. *Bachner v. Rich, supra* at 441–42; *Breitkreutz v. Baker*, 514 P.2d 17, 22 (Alaska 1973). *Accord, Lester v. John R. Jurgensen Co.*, 400 F.2d 393, 396 (6th Cir. 1968) (applying Ohio law).

■ The construction requirement contained in the U.B.C. meets the criteria developed in *Ferrell* and its progeny. Defendant claims, however, that *Ferrell* is inapposite because it was limited to traffic violations and its principles should not be

---

**8.** The record reflects no such delegation. *Cf. State v. Jennings*, 555 P.2d 248, 250–51 (Alaska 1976) (state not liable for city's negligent fire inspection where city has assumed independent responsibility for fire protection).

**9.** The trial court's instructions to the jury were based upon the "presumption of negligence"

approach to violations of statute rather than upon the doctrine of negligence *per se. See generally* W. Prosser, The Law of Torts § 36 (4th ed. 1971). Though defendant objected to the wording of these instructions, it did not raise this point on appeal, and, therefore, cannot now complain. *See* App. R. 9(e).

applied to a building code.[10] However, in *Bachner, supra,* we extended application of the doctrine of negligence *per se* beyond traffic regulations.[11]

■ Defendant also argues that the policies which led us in *Ferrell* to apply the doctrine of negligence *per se* to violations of traffic laws are absent in the building code situation. It argues that the need for a "societal-governing norm" no longer exists, *Ferrell, supra* at 262, since AS 18.70.095 now requires smoke detectors. But we are not persuaded that a provision for smoke detectors is a sufficient norm to supersede all others, even if under the U.B.C. smoke detectors alone or in combination with other devices might have been a sufficient substitute for one-hour construction. In any event, the Northern Lights Motel did not have smoke detectors. Even if AS 18.-70.095 were to provide the only norm in this area, it was not passed until 1975, long after both the construction of the building and the fire.

Defendant further argues that the provisions of the U.B.C. are "obscure," and not generally known and obeyed. *See Ferrell, supra* at 263–64. It cites *McLinn v. Kodiak Elec. Ass'n, Inc.,* 546 P.2d 1305, 1314 (Alaska 1976). There we held that the trial court did not abuse its discretion by failing to give a negligence *per se* instruction because it felt that "a reasonably prudent person . . . would not have been aware of the applicability" of the regulation since it was imprecisely worded.[12] We noted that under *Ferrell* a traffic law would not be substituted as the applicable standard of care where it "is somewhat obscure and unknown to the motoring public generally." *McLinn, supra* at 1314.

■ Unlike *McLinn,* the trial court here exercised its discretion in favor of giving the negligence *per se* instruction. We hold that the trial court did not abuse its discretion in ruling that a reasonably prudent person might be aware of the U.B.C. provisions, and of their applicability to the instant case. The Code has been in effect in Alaska since at least 1959. There was evidence that the U.B.C. was recognized in Anchorage in 1964; the same testimony indicated that the code was disregarded in some respects due to soil conditions, but that does not affect the one-hour construction requirements. "Just as the automobile driver must know and obey the rules of the road, the contractor must know and obey the rules of his trade." *Bachner, supra* at 441. Thus the court could reasonably have concluded, in its discretion, that the U.B.C. was not so "obscure" or "unknown" to warrant a refusal to give the negligence *per se* instruction.

" 'Obviously cases will be relatively infrequent in which legislation directed to the safety of persons or property will be so obsolete, or so unreasonable, or for some other reason inapplicable to the case, that the court will take this position; but where the situation calls for it, the court is free to do so.' " *Ferrell, supra* at 264 n. 23, quoting Restatement (Second) of Torts § 286, comment d (1965).

The U.B.C. provisions in question are not so arcane or unreasonable that compliance

---

**10.** The frequent mention of traffic laws in the case was not necessarily intended as a limitation on its applicability. Neither was the characterization of *Rogers v. Dubiel,* 373 P.2d 295 (Alaska 1962), as concerning a violation of traffic law, *Ferrell, supra* at 256, meant as a limitation on the doctrine. The language was quoted and emphasized to show that *Rogers* was decided on a theory of negligence *per se,* and not *res ipsa loquitur.*

**11.** *See also Krall v. Royal Inns of America, Inc.,* 374 F.Supp. 146, 148 (D.Alaska 1973) (Plummer, J.) (Alaska Safety Code); *Vance v. United States,* 355 F.Supp. 756, 758–59 (D.Alaska

1973) (licensed liquor establishment); *Spruce Equipment Co. v. Maloney,* 527 P.2d 1295, 1297 (Alaska 1974); *see generally* Comment, Ferrell v. Baxter: Negligence Per Se in Alaska, 2 U.C. L.A.–Alaska L.Rev. 54 (1972) (urging extension of *Ferrell* beyond traffic regulations).

**12.** Once the four criteria of Restatement (Second) of Torts § 286 (1965) are met, the trial court may adopt the statutory standard as negligence *per se,* but is not compelled to do so. 546 P.2d at 1314. Thus in *McLinn* the standard of review was abuse of discretion. *Accord, Bachner, supra* at 440–41 n. 11.

with them would be virtually impossible.[13] Nor does the application of the U.B.C. in the case at bar impose liability without fault. Objections to its use as a standard should be analyzed as excuses. This would shift the burden to the defendant to show why compliance was unreasonable. *See Bachner, supra* at 445; *Ferrell, supra* at 262. For example a defendant in Bethel or Barrow might wish to produce evidence of local building practicalities, and argue that "he is unable after reasonable diligence or care to comply." *See* Restatement (Second) of Torts § 288A(2)(c) (1965), set forth in note 15 *infra*.

■ Defendant's argument that regulations based on the U.B.C. should not be adopted as negligence *per se,* is not persuasive. That these are regulations rather than statutes has no effect on their applicability as a standard of care in civil cases. *See McLinn v. Kodiak Elec. Ass'n, Inc., supra* at 1313; *accord, Rietze v. Williams,* 458 S.W.2d 613, 617 (Ky.1970). A fire regulation need not specifically impose civil liability in order for a violation to be the basis of negligence *per se. Strahl v. Miller,* 97 Neb. 820, 151 N.W. 952, 953, *aff'd,* 239 U.S. 426, 36 S.Ct. 147, 60 L.Ed. 364 (1915). *See generally Sanchez v. J. Barron Rice, Inc.,* 77 N.M. 717, 427 P.2d 240, 244–45 (1967); *Rietze v. Williams,* 458 S.W.2d 613, 617 (Ky. 1970) (violations of plumbing or plumbing gas codes held to be negligence *per se*);

*Derboven v. Stockton,* 490 S.W.2d 301, 313 (Mo.App.1973), (negligence *per se* applicable to fire ordinance and statute violations). The cases which defendant cites are inapposite and do not detract from the applicability of these principles to this case.[14]

■ We hold, therefore, that the trial court's instruction set forth in full on page 1180 *supra* on the effect of a violation of the U.B.C. was not error.

*Excuse*

■ Defendant asserts that the excuse instruction given by the court was inadequate. Instruction No. 22 provided in part that the defendant had to prove that its violation of the law "resulted from causes or things beyond the control of such party and that he was not negligent." In *Ferrell v. Baxter, supra* at 263–64, we adopted the principles expressed in the Restatement (Second) of Torts as the law in this area.[15] However, if a party does not offer evidence of an excuse or if it does not request an instruction on an excuse which it claims to be applicable, no instruction on the subject needs to be given by the trial court. *Ferrell v. Baxter, supra* at 266.

We need not decide whether defendant's assertions of excuse which were not covered by Instruction 22 should have been treated therein. Defendant did not properly preserve this point in the trial court. At the

**13.** Compare a speed limit of six miles per hour. *See* W. Prosser, The Law of Torts § 36, at 200 (4th ed. 1971).

**14.** *Hassan v. Stafford,* 472 F.2d 88, 93–94 (3rd Cir. 1973); *Brewer v. Roosevelt Motor Lodge,* 295 A.2d 647, 650–51 (Me.1972); *Major v. Waverly & Ogden, Inc.,* 7 N.Y.2d 332, 197 N.Y.S.2d 165, 165 N.E.2d 181 (1960); *Buck v. Del City Apartments, Inc.,* 431 P.2d 360, 364 (Okl.1967).

**15.** Restatement (Second) of Torts § 288A (1965) provides:

"(1) An excused violation of a legislative enactment or an administrative regulation is not negligence.

(2) Unless the enactment or regulation is construed not to permit such excuse, its violation is excused when

(a) the violation is reasonable because of the actor's incapacity;

(b) he neither knows nor should know of the occasion for compliance;

(c) he is unable after reasonable diligence or care to comply;

(d) he is confronted by an emergency not due to his own misconduct;

(e) compliance would involve a greater risk of harm to the actor or to others."

Restatement (Second) of Torts § 288B (1965) provides:

"(1) The unexcused violation of a legislative enactment or an administrative regulation which is adopted by the court as defining the standard of conduct of a reasonable man, is negligence in itself.

(2) The unexcused violation of an enactment or regulation which is not so adopted may be relevant evidence bearing on the issue of negligent conduct."

hearing on jury instructions, defense counsel argued that no negligence *per se* instructions should be given, and that the building code was not promulgated in accordance with the law. He made no mention of the instruction on excuse. Defendant did set forth the text of § 288A in its trial memorandum, but this is inadequate to put before the trial court an objection to a specific jury instruction, or a request for an instruction which the trial court did not give.[16] *See Haskins v. Shelden,* 558 P.2d 487, 491–92 (Alaska 1976); *Spruce Equipment Co. v. Maloney,* 527 P.2d 1295, 1301–02 (Alaska 1974). At oral argument before us, appellant's current counsel (not its trial counsel) conceded that no objection was made to the instruction on excuse at trial, nor was an instruction in conformity with Restatement § 288A ever requested. We will not consider points which were not raised properly in the trial court. *Lumbermens Mutual Cas. Co. v. Continental Cas. Co.,* 387 P.2d 104, 109 (Alaska 1963).

## II.

### *Imputation of Knowledge*

Defendant next challenges the trial court's instruction to the jury concerning the imputation of knowledge of the lack of one-hour construction to it. Defendant notes that the duty of an innkeeper to his guest in Alaska is the same as that of a landowner towards a business invitee; that is, to "take reasonable care to discover the actual condition of the premises and either make them safe or warn [the invitee] of any dangerous condition." *Silverton v. Marler,* 389 P.2d 3, 4 (Alaska 1964); *see generally*

Restatement (Second) of Torts § 343 (1965). However, defendant asserts that it had no knowledge, actual or imputed, of the lack of one-hour construction, and could not by reasonable inspection have discovered it. There is no dispute that it had no *actual* knowledge.

■ Defendant objects to Instruction No. 11A in light of Instruction No. 22B. Instruction No. 11A states:

"Knowledge of a defective or dangerous condition created by an owner or his employee acting within the scope of his employment, is imputed to the owner as a matter of law from the time of its creation.

Knowledge of any defective or dangerous condition obtained by an employee of an owner in the course and scope of his employment is imputed to the owner as a matter of law."

Instruction No. 22B states:

"Since everyone is required to act with knowledge of what the law forbids and what the law requires to be done, the provisions of law set forth in 13 AAC 50.010, just read to you, are to be considered by the jury as one of the circumstances in evidence in the case, surrounding the conduct of the defendant, Northern Lights Motel, Inc."

Defendant argues that the effect of these instructions, together with Instruction No. 21 which contained the U.B.C. provisions, was to impute knowledge to Northern Lights Motel, Inc., as a matter of law. Actually, the court explicitly imputed knowledge to the corporation. There is no need for speculation on the point.[17] The theory

---

**16.** Civil Rule 51(a) reads in part: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

*Cf.* Civil Rule 46(f), which reads in part: "[F]or all purposes for which an exception has heretofore been necessary it is sufficient that a party, *at the time the ruling or order of the court is made or sought,* makes known to the court the action which he desires the court to take or his objection to the action of the court

and his grounds therefor . . . ." (emphasis added).

**17.** This ruling, made out of the jury's presence, was impressed upon the jury by plaintiff's counsel in his final argument:

"I have to say I was more than a little distressed by a good part of Mr. Hagans off—or argument. That part of it which seemed to be suggesting to you that you ought to ignore the instructions of the court with regard to the imputation of knowledge to the defendant, Northern Lights Motel, Inc. I'm going to read that to you again because it's very im-

was that as a builder Mr. Rayhoe's knowledge of construction materials and methods was imputable to both Mr. and Mrs. Cox, since they were owners of the property as tenants by the entirety. Her knowledge was then further imputed to Northern Lights Motel, Inc. Defendant concedes that any knowledge possessed by Mrs. Cox may be imputed to the corporation since she is the sole shareholder and officer. Defendant denies, however, that knowledge of the lack of one-hour construction in the motel should be imputed to Mrs. Cox. The problem is that while Mr. Rayhoe was unquestionably Mr. Cox's employee, it is less clear that he was Mrs. Cox's employee.

It appears that the court misinterpreted the California pattern jury instruction on which it based Instruction No. 11A, and imputed knowledge to Mrs. Cox simply because she was a co-owner.[18]

 Since Edna Cox's undisputed co-ownership of the motel is not sufficient to impute knowledge to her, we must turn to the evidence of partnership or joint venture. A joint venture has been defined as "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge." *State ex rel. McCrory v. Bland,* 355 Mo. 706, 197 S.W.2d 669, 672 (1946). The joint venture may be established without any formal agreement between the parties; it may be implied from the facts or circumstances of the case. *Id.* Although each venturer need not exercise actual physical control of the instrumentalities used in the enterprise each must have a legal right to some voice in the direction and control of the enterprise. *Murphy v. Keating,* 204 Minn. 269, 283 N.W. 389, 392–93 (1939).

It is a reasonable inference that Jack and Edna Cox were engaged in a joint venture or partnership in addition to owning the structure as tenants by the entirety. Jack Cox went into the building business so that he could "learn on the job," building for himself. The couple was married in 1949, and Mrs. Cox testified that "we started building about a week after we were married." Prior to 1964, Mrs. Cox did little of the work other than collecting rents and doing jobs such as painting, because she had a civil service job. However, it would be a fair inference that her job was intended as a means of financing the building project. "I supplied the paychecks really," she testified. After she quit her job, she agreed, she took a "more active role" in the construction, management and rental of the buildings. The business appears to have prospered even after Mr. Cox's death on July 4, 1968, and in 1972, at the time of the fire, Mrs. Cox owned personally or in corporate status over 100 units. Asked to state her occupation at the outset of her testimony, she said "Builder, landlady." Repeatedly she used the words "we" or "our" in describing the enterprise. Mr. and Mrs. Cox were thus joint venturers or partners. *See Reynolds v. Patrick,* 198 Misc. 201, 97 N.Y.S.2d 126, 128 (1950). Mrs. Cox testified that Rayhoe had "worked for me" for 20 years and that he had been "on my payroll". Since Mr. and Mrs. Cox were partners or joint venturers, Rayhoe's knowledge can be imputed to Mrs. Cox as a matter of agency law. *See Reynolds v. Patrick, supra* at 128;

portant. It has nothing to do with whatever personal knowledge Edna Cox had or not. *It is as a matter of law she had that knowledge and the Northern Lights Motel, Inc. had that knowledge and that's this instruction:* Knowledge of a defective or dangerous condition created by an owner or his employee acting within the scope of his employment is imputed to the owner as a matter of law from the time of its creation. You are not permitted to ignore that. You—we relied on your promise that you would follow the law in this case." (emphasis added).

18. Instruction No. 11A was based upon B.A.J.I. 8.21 (5th ed. 1969) which in turn was based upon *Hatfield v. Levy Bros.,* 18 Cal.2d 798, 117 P.2d 841 (1941). In that case the two owners of the store admitted they jointly controlled store operations, and for that reason were held jointly liable under the principle of *respondeat superior. Id.,* 117 P.2d at 846. It was the admission of joint control, not mere joint ownership, that in effect established a business partnership or joint venture, and caused knowledge to be imputed to the other owner.

Restatement (Second) of Agency § 272 (1958).

Knowledge can also be imputed to Mrs. Cox through the borough fire inspector. Defendant's attorney admitted at final argument that Mrs. Cox knew what the borough fire inspector reported. His report was signed by Tillie Legg, Mrs. Cox's "Business Representative." The report states that the ceiling and walls of the building were constructed of "½ in. Gyp board." This is itself a violation of the U.B.C. one-hour construction requirement, and hence constituted notice of the facts sufficient to warrant a finding of negligence *per se.*

■ Although the issue is close, we conclude it was not error for the trial court to decide that as a matter of law knowledge could be imputed to Mrs. Cox, instead of leaving the question for the jury. Knowledge of the manner of construction of the motel will be imputed by the law to Edna Cox on two theories: first, she and her late husband were joint venturers, and second, her agent Tillie Legg knew of the fire inspection report.

### III.

#### *Degenkolb's Expert Testimony*

Northern Lights Motel objects to the admission of fire expert Degenkolb's opinion that the lack of one-hour construction caused Stumbaugh's death. First, defendant objects that Degenkolb discussed "fire loading" in giving his opinion. "Fire loading" is the weight of combustible material in a room divided by the square feet of floor area in that room. The determination of "fire loading" depends upon what furniture was in room 15, where the fire broke out. Defendant argues that this information, which was never admitted at trial, must have come from the report of Robert Timlin, defendant's expert investigator, or from unadmitted portions of Timlin's deposition.

Degenkolb indicated on cross-examination that he had read the report, but in forming his opinion was not consciously considering anything in it. He said his information about the room furniture was based only on Timlin's testimony that the fire started on the chair and in the sofa or whatever was alongside the chair. Although the chair was mentioned in deposition testimony, admitted in evidence, Timlin's testimony did not refer to the sofa. The sofa was mentioned, and its remains were shown in Timlin's report.

Defendant relies on the general principle that an expert witness cannot base his opinion on facts not in evidence. In *Adkins v. Lester,* 530 P.2d 11, 17 (Alaska 1974), we stated:

"[A]n expert witness is permitted to testify to an opinion based upon matters already before the jury or within his personal knowledge."

In *Crawford v. Rogers,* 406 P.2d 189, 191 (Alaska 1965), we held that hypothetical questions are unnecessary where the facts forming the basis of the expert's opinion are already in evidence, and it is clear to the jury from the expert testimony on what basis the opinion rests.

"The general rule is that when the facts on which an opinion is based are not within the expert witness's own personal knowledge, such facts must have been supplied to the jury by other evidence and then presented to the witness hypothetically before his opinion may be received. The reason for the rule is that the witness's conclusion depends for its validity upon facts considered by him; and if the facts are not made to accompany the conclusion, then the jury would be asked to accept as evidence a conclusion which might not be supported by any evidence produced at the trial and which, therefore, the jury would have no basis for finding to be true.

The rule has no application when the reason for its existence is lacking."

■ A hypothetical question which contains important assumptions not supported by admitted evidence is objectionable. *Zerbinos v. Lewis,* 394 P.2d 886, 888 (Alaska 1964). However, if a hypothetical contains only immaterial variances from the evidence which do not form the crux of the

hypothetical, the opinion should be permitted to go to the jury, with cautionary instructions. *Maddocks v. Bennett*, 456 P.2d 453, 456 (Alaska 1969). The trial court has discretion to determine whether the variances are material. *Davis v. Chism*, 513 P.2d 475, 485 (Alaska 1973).

■ Here, in responding to the question the witness may have had in mind a statement in Timlin's report that there was a sofa in room 15. But Degenkolb's own testimony indicates that this was not the basis of his opinion, contrary to defendant's assertion. He stated that studies have shown an ordinary residence or apartment house has a fire loading of between 7 to 8 pounds per square foot. A hotel should have less, since transients "have not accumulated as much material to keep in a room. . . ." Degenkolb estimated it at 6 pounds per square foot. Since one-hour construction should have contained a fire in a room with fire loading of 10 pounds per square foot, and since the one-hour construction boiler room next to room 15 was undamaged, Degenkolb concluded that one-hour construction would have prevented the fire's rapid and undetected escape from room 15, and hence would have prevented Stumbaugh's death. Thus, the description of furniture in room 15 was immaterial, since Degenkolb in fact relied on a norm rather than the description. Assumptions based on the norm are permissible in the absence of proof that the facts varied materially from that norm. *Haisley v. Grant*, 486 P.2d 367, 370–71 (Alaska 1971). The hypothetical itself did not vary from the evidence, and Degenkolb did not rely on Timlin's report in determining the probable fire loading of the room. Furthermore, on cross-examination the jury was presented with the possibility that Degenkolb had unadmitted evidence in mind, and subconsciously relied on it in arriving at his opinion. Weaknesses in data used by an expert in formulating his opinion are properly weighed by the jury after being brought out by cross-examination. *Id.* at 370. The jury should normally decide whether an expert's opinion is based on

sufficient facts. *Maddocks v. Bennett, supra*, at 455.

■ Defendant also objects to Degenkolb's opinion, because it claims that he was only speculating as to the possibility of the fire spreading outside the building, even if prevented from spreading internally by one-hour construction. The following exchange took place on cross-examination:

"A You asked whether I had an opinion. And I think that if it had been one hour fire resistive construction I don't think the fire would have spread to the second floor.

Q But you said it could have come outside and then gone around that way, didn't you?

A That's right.

Q And wouldn't Mr. Stumbaugh and the other people have been involved in it?

A If there had been no outside detection of the fire and it had burned free, certainly.

Q How do you know it would have been detected?

A I don't know. But this was in a town. There were people driving by. There were police officers in the vicinity; and I would think that a fire that would glow in the night that way would be seen by somebody else.

Q Well, in any event . . .

A I can't say it.

Q . . . you can't say that. It's pure speculation, isn't it?

A That's right.

MR. HAGANS: [Defense Counsel] Move to strike his opinion."

In *INA Life Ins. Co. v. Brundin*, 533 P.2d 236 (Alaska 1975), an expert witness, Dr. Rhyneer, testified that an ultimately fatal heart attack resulted from the surgery deceased was undergoing at the time. We observed that while Dr. Rhyneer was speculating as to the exact cause of cardiac arrest, his conclusion that it was related to the surgery was based on both the statistical rarity of cardiac arrest and the fact that

the range of its possible causes were mainly surgery-related:

"While he could not say which among these causes was the direct precipitating factor, his knowledge of the relation of each of the possible causes to the surgery rendered his opinion proper expert testimony and not mere speculation. We find no error in the admission of his testimony." *Id.* at 244.

Here, as in *Brundin,* the expert knew the surrounding circumstances. He could not have known exactly who would have detected the fire had it spread externally, but he could have concluded it was reasonably probable [19] that someone would have done so. His testimony could be construed as indicating that while he was speculating as to the exact means of discovery, his basic opinion was by no means speculative.

The trial judge did not abuse his discretion in determining that the jury could receive appreciable assistance from Degenkolb's testimony. *See Davis v. Chism,* 513 P.2d 475, 485 (Alaska 1973); *Maddocks v. Bennett,* 456 P.2d 453, 455 (Alaska 1969); *West v. Estate of Nershak,* 440 P.2d 119, 121 (Alaska 1968); *Crawford v. Rogers,* 406 P.2d 189, 192 (Alaska 1965). *Cf. Lewis v. State,* 469 P.2d 689, 695 (Alaska 1970). There was no error in the admission of Degenkolb's testimony.

## IV.

### Pain and Suffering

■ Defendant asserts that it was error to instruct the jury on pain and suffering, since there was no evidence to support any survival award. It is true that no award should be made for any pain and suffering "substantially contemporaneous with death or mere incidents to it." *St. Louis, Iron Mtn. & So. Ry. v. Craft,* 237 U.S. 648, 655, 35 S.Ct. 704, 59 L.Ed. 1160 (1915); S. Speiser, Recovery for Wrongful Death § 14:5, at 756 (1966). "Recovery can be had only for pain consciously experienced, and events subsequent to unconsciousness are not compensable." *Burrous v. Knotts,* 482 S.W.2d 358, 363 (Tex.Civ.App.1972).

Dr. Propst testified that Stumbaugh died of "asphyxia from inhalation of carbon monoxide." He testified that the brain would probably be the first important organ to suffer. Carbon monoxide begins to have its effect within 2 to 3 breaths; the average person breathes about 12 times per minute.

"One who walks into an atmosphere of carbon monoxide would initially notice some dizziness, a headache, a feeling of the blood pounding in their head, and this would rapidly progress in a high carbon monoxide concentration to delirium, stuporous condition, coma and death."

While Dr. Propst did testify that Stumbaugh was alive at the start of the fire, he testified that the body showed only "severe *post mortem* incineration" (emphasis added).

Stumbaugh's struggles with Magnuson indicate he was alive at least at that time, and Magnuson testified that the room was already filled with smoke. The smoke caused Magnuson considerable discomfort, and whatever was burning in the room at the time singed hair off his arms and face. Magnuson found Stumbaugh lying on the floor at the back of the room. It is a possible inference that Stumbaugh had tried to get out, while suffering from the smoke, and had collapsed before Magnuson arrived. He was still alive while he struggled with Magnuson, and may have suffered some of the same discomfort. And Magnuson indicated that the room burst into flames at about the time that Stumbaugh kicked loose from his would-be rescuer.

The jury was instructed that damages should not be awarded for pain and suffering "as a mere incident of death or substantially contemporaneous with it," and that only conscious pain and suffering was compensable. There is no indication in the record of how much of the jury award, if

---

19. *See Davis v. Chism,* 513 P.2d 475, 483 (Alaska 1973); *Maddocks v. Bennett,* 456 P.2d 453, 458 (Alaska 1969).

any, was for pain and suffering. However, the evidence supports the inference that Stumbaugh may have suffered for a short time before his death.[20] We hold that the superior court properly instructed the jury to consider the question and, therefore, committed no error in this respect.

## V.

### Evidence of Additional Safeguards

Defendant objected to the introduction of evidence that the Northern Lights Motel had no resident manager, smoke detectors, or sprinkler system at the time of the fire, on grounds that it was irrelevant because plaintiff had shown no community standard requiring these measures. Early in the trial, the court admitted evidence concerning lack of a resident manager and lack of smoke detectors on the ground that the accumulation of things that the defendant failed to do might be determined to be negligence by the jury under a general negligence instruction. Later, evidence concerning smoke detectors and sprinkler systems was admitted on assurance that a fire expert would testify that there were "at least an array or range of safety protective devices that should be installed in a building of this character when it's for public occupancy . . . ." Such testimony was received from Mr. Degenkolb, who testified that under the 1955 Uniform Building Code § 508 a sprinkler system or smoke detectors either alone or in combination with other measures might be used as a substitute for the one-hour construction.

The evidence concerning the sprinkler system and smoke detectors was properly admitted. Plaintiff's case was based in part on violations of the Uniform Building Code, and lack of one-hour construction could be excused by use of these alternatives, according to the testimony. Counsel argued to the jury that if a motel owner knew he had "a bad building" another alternative might be to keep a resident manager awake on the premises at all times, but no testimony linked this alternative specifically to the code. The question thus becomes whether such evidence is relevant to the general common law standard, since the case was submitted to the jury under both the negligence *per se* theory based on the code, and ordinary common law negligence doctrines.

Courts generally hold that there is no common law duty to maintain a " 'fire proof hotel'." *Mozer v. Semenza,* 177 So.2d 880, 882 (Fla.App.1965).[21] But the *Mozer* court, after reviewing the authorities, concluded that "it is the duty of an innkeeper to provide reasonably safe premises for the housing of its guests," and held that the maintenance of an unenclosed stairwell constituted a violation of that duty.[22] *Id.* We found a similar duty in *Silverton v. Marler,* 389 P.2d 3, 4 (Alaska 1964) (lodge operator owes paying guest duty to keep premises in reasonably safe condition); *see* Annot., 60 A.L.R.3d 1217 (1974) and cases cited therein. Thus the evidence of lack of a resident manager (and sprinkler system and smoke detectors) is relevant under the ordinary negligence standard.

The lack of any evidence of a community standard should not prevent the introduction of this evidence. Even assuming there was no other hotel or motel in the Anchorage area taking any such precautions, and that a community custom against use of such devices was established, that custom would still not be conclusive. "Even an

**20.** In *Burrous v. Knotts,* 482 S.W.2d 358, 363 (Tex.Civ.App.1972), cited by defendants, the Texas Court of Civil Appeals allowed $10,000 after remittitur for only ten conscious minutes in a fire, prior to death.

**21.** *Accord, e. g., Hays v. Texan, Inc.,* 174 S.W.2d 1006, 1009 (Tex.Civ.App.1943).

**22.** English courts have held there is "an implied warranty arising from the relation of innkeeper and guest, that the premises of the innkeeper are as safe as reasonable care and skill can make them. Under this doctrine it seems that a liability exists for injury to a guest by fire caused by the defective condition of the premises, due to the neglect of 'any person connected with the construction, alteration, repair, or maintenance of the premises.' " Annot., 37 A.L.R. 158 (1925).

entire industry, by adopting such careless methods to save time, effort or money, cannot be permitted to set its own uncontrolled standard." W. Prosser, The Law of Torts § 33, at 167 (4th ed. 1971). Conformity with such a standard might, in some cases, permit a directed verdict that there was no negligence, if there were nothing in the evidence or in common experience to suggest otherwise. But "where common knowledge and ordinary judgment will recognize unreasonable danger, what everyone does may be found to be negligent . . . ." *Id.* at 168 (footnote omitted). *Accord, The T. J. Hooper,* 60 F.2d 737, 740 (2d Cir.) (L. Hand, J.), *cert. denied, Eastern Transportation Co. v. Northern Barge Corp.,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).

The trial court held that hotel management was such a technical subject that expert testimony would be necessary before evidence of defendant's lack of safety precautions could be admitted. As we have seen, plaintiff later linked Degenkolb's expert testimony concerning alternatives under the Uniform Building Code to testimony about the sprinkler system and smoke detectors.

We do not see why the use of an all night manager, or a sprinkler or smoke detectors, is a matter of such professional abstrusity that standards can be determined only with the aid of expert testimony. This may be true of one-hour construction in buildings or other technical matters; but it is difficult to imagine what areas of business endeavor would not require expert testimony if expert testimony were required here. Hence, we conclude that the trial court erred in requiring expert testimony on the standard of care. It did not err, however to the extent that it permitted testimony that the Northern Lights Motel failed to employ various safety measures.

AFFIRMED.