Charles HARNED and Providence
Washington Insurance Company
of Alaska, Appellants,

v.

DURA CORPORATION, Appellee.

No. 6150.

Supreme Court of Alaska.

June 3, 1983.

**6**

Mark A. Sandberg, Henry Camarot, Camarot, Sandberg & Hunter and Mary D. Killorin, Anchorage, for appellants.

John W. Abbott and Kenneth M. Rosenstein, Abbott, Lynch & Farney, Anchorage, for appellee.

Before BURKE, C.J., and RABINOWITZ, CONNOR, MATTHEWS, and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

Charles Harned (Harned)[1] filed suit against Dura Corporation (Dura) seeking compensation for injuries he sustained when a portable compressed air tank allegedly manufactured by Dura's predecessor in interest, Electronics, Inc.,[2] exploded and severed his left arm. The jury unanimously entered a defense verdict, and Harned appealed, challenging three rulings of the superior court.

On July 25, 1977, Harned was working as a general mechanic at A & M Motors, a Winnebago dealership. As he filled a portable air tank from a compressor, the tank exploded and a piece of it severed his left arm at the elbow. Harned sued Dura, corporate successor to the manufacturer of the tank, alleging that the explosion was caused by the defective design and manufacture of the tank. He asserted that the tank should have contained a valve at the bottom which could be opened to drain moisture accumulating inside. Since it did not, water remained inside, causing the tank to corrode and finally explode when the weakened walls were unable to withstand the pressure of the compressed air. Dura denied that the tank was manufactured by Electronics, Inc. and claimed that the explosion was caused by poor maintenance rather than defective design.

## LIMITATION OF CROSS–EXAMINATION

Harned contends that the superior court erred in limiting the scope of his cross-examination of Harold Pendell, a mechanical engineer who testified as an expert witness on Dura's behalf. Pendell was asked by Dura whether, in his opinion, the tank that injured Harned complied with American Society of Mechanical Engineers (ASME) standards. He responded that the tank did not need to conform to the ASME Code since it was not legally binding in every state. The record further indicates that had Pendell been permitted to continue, he would have testified that the Code had not been adopted in South Dakota at the time the tank was manufactured.[3] Harned objected to this line of questioning on the ground that Pendell was not qualified to testify concerning compliance requirements in Alaska. His objection was sustained on the ground that the court would instruct the jury regarding relevant legal standards. Harned later inquired of the court whether he could cross-examine Pendell regarding the tank's compliance with the ASME Code. The superior court indicated it would not permit this questioning since Dura had not pursued on direct its line of inquiry regard-

1. The role of the Providence Washington Insurance Company of Alaska, Harned's co-plaintiff and co-appellant, is not evident from the record. Presumably, the company is exercising subrogation rights arising from payment of worker's compensation benefits to Harned. *See* AS 23.30.015(g) and AS 23.30.015(i).

2. The tank was allegedly manufactured between 1961 and 1963 by Electronics, Inc. of Vermillion, South Dakota under the Electro-Magic brand label. Electronics, Inc. was dissolved and the Electro-Magic line was acquired by Dura Corporation in 1964. The superior court ruled that Dura was liable for torts committed by its predecessors, and so instructed the jury. Dura did not appeal this ruling.

3. Dura's counsel made an offer of proof, disclosing on the record the content of that portion of Pendell's testimony excluded by the court's ruling on Harned's objection.

ing the Code. Harned did not object to this implied restriction.[4]

On appeal, Harned argues that had he been permitted to cross-examine on the subject, he would have elicited testimony from Dura's expert witness confirming the fact that the tank did not conform to ASME standards. He contends that he chose not to pose these inquiries at trial, construing the superior court's remark as a "threat" that such questions would "open the door" to "irrelevant and prejudicial" testimony regarding South Dakota law. Harned argues that such a "threat" unreasonably restricted his "absolute right" of cross-examination. *Alaska Airlines, Inc. v. Sweat,* 568 P.2d 916, 931 (Alaska 1977).

■ We hold that Harned's failure to lodge a contemporaneous objection to the superior court's cross-examination ruling precludes consideration of this issue on appeal.[5] *Matter of C.L.T.,* 597 P.2d 518, 522–23 (Alaska 1979); *Chugach Electric Ass'n v. Lewis,* 453 P.2d 345, 349 (Alaska 1969).

■ On the other hand, this court will consider plain error, even though not objected to below, if it is so substantial as to result in a miscarriage of justice. *Matter of C.L.T.,* 597 P.2d at 523. Even if we assume Harned was correct in alleging the superior court acted improperly in limiting the scope of his cross-examination of Pendell, we do not believe it was so substantial as to result in a miscarriage of justice. Had Pendell testified on cross-examination that the tank did not conform to ASME standards, his testimony would have been merely cumulative.[6] In this regard, Harned's expert witness had previously testified that the tank which caused the injury did not comply with the ASME Code. Moreover, Pendell himself stated that he would not design a tank in accordance with specifications similar to those of the tank that injured Harned. Accordingly, we conclude that invocation of the plain error doctrine to reach this issue of a purportedly erroneous limitation of cross-examination would be inappropriate.

## EXCLUSION OF EVIDENCE IN REBUTTAL OF DURA'S OPENING STATEMENT

Harned argues that the superior court erred in refusing to permit him to rebut an assertion made by Dura's counsel during his opening argument. Although we have concluded that the remarks in question were improper, and that Harned should have been allowed to introduce "curative" evidence on rebuttal, we conclude that the error is harmless.

Dura's counsel made the following statement during his opening argument:

> We will also call John Oldham. Now, John Oldham is one of the vice presidents for Dura Corporation. And he of course will testify as to one matter, and that is that—and I'll go back to the tank, because we have all these tanks popped open here—that in no case, not in any one of these cases, has Dura Corporation been found negligent. In these cases. And that's important. I think that's important. These cases—these tanks may be

4. The entire colloquy at the bench was as follows:

> MR. SANDBERG [counsel for Harned]: In light of—
> THE COURT: —Keep it down low—
> MR. SANDBERG: In light of the fact— Well, in light of what has been discussed, may I inquire about the code and whether or not various features of this tank comply with the code, and we'll sort out the evidentiary value of that later when the jury gets an instruction on whether it's evidence of negligence or negligence per se or whatever.
> MR. HANSON [counsel for Dura]: There is no testimony as to the provisions of the code themselves, you know, as to how they apply. I think it's beyond the scope, plus I think it confuses the issue at this point in time.

> THE COURT: He hasn't gone into the code with the guy at this point. I mean, you want him to talk about the code or you want him not to talk about the code.
> MR. SANDBERG: All right. We'll leave the code out at this point.
> THE COURT: All right.

5. Harned neglected to set forth this issue in his Statement of Points on Appeal. This omission alone would be sufficient to preclude consideration of his claim. Alaska R.App.P. 210(e); *see, e.g., Wetzler v. Wetzler,* 570 P.2d 741, 742 n. 2 (Alaska 1977) (per curiam).

6. *See Sloan v. Atlantic Richfield Co.,* 541 P.2d 717, 722 n. 7 (Alaska 1974).

open, but I think it's important to note that in not any incident which Plaintiff is going to refer to has there been a finding of negligence. And that's an issue which I think you should keep in mind.

Harned contends that this passage referred to inadmissible evidence, that it was extremely misleading, and that he should have been permitted to counter its prejudicial effect either with testimony regarding the disposition of the other lawsuits pertaining to tanks manufactured by Dura which had exploded, or with a reference in closing argument to Dura's failure to produce Mr. Oldham.

Harned is correct in claiming that Dura's counsel exposed the jury to prejudicial argumentation in his opening statement. In general, prior verdicts are not relevant in subsequent trials involving different parties and factual settings. It follows that it is improper for counsel to advert to the disposition of the same or similar cases during argument to the jury.[7] Dura does not suggest that the testimony of

Mr. Oldham would have been relevant to an issue properly before the court.[8] Thus, counsel's statement constituted a reference to inadmissible and potentially prejudicial evidence which should have been excluded upon proper objection.[9]

Harned did not raise an objection to the statements of Dura's counsel at the time they were made. However, during the presentation of his case he attempted to introduce testimony regarding litigation that arose from one of the explosions. Dura's objection that the proferred testimony was irrelevant was sustained,[10] and subsequently Mr. Oldham was not called as a witness by Dura. In addition, the superior court did not permit counsel for Harned to rebut Dura's statement during closing argument, or to discuss the fact that Dura had failed to produce Oldham's promised testimony. The superior court in so ruling reasoned in part that to permit such an argument would constitute "an incursion into [irrelevant] areas that need not be rehashed after two weeks [of trial]." The superior court

---

7. *See, e.g., Salgo v. Leland Stanford Jr. University Board of Trustees,* 154 Cal.App.2d 560, 317 P.2d 170, 182 (Cal.App.1957) (reference in argument in malpractice action to judgments given in other malpractice actions); *see also* Annot., 15 A.L.R.3d 1101 (1967) (regarding impropriety of references to the results of former trials of the same case).

8. Dura claims that its contested opening remark was made in response to Harned's reference to explosions of similar Electro-Magic tanks and that even assuming *arguendo* that its remark was improper, it was justified under the doctrine of "curative admissibility," which permits the use of otherwise inadmissible evidence to rebut the effect of inadmissible evidence already before the jury. *See, e.g., Patricia R. v. Sullivan,* 631 P.2d 91, 97 (Alaska 1981); C. McCormick, Law of Evidence § 57 at 131–33 (2d ed. 1972). *See also Haynes v. Monroe Plumbing and Heating Co.,* 48 Mich.App. 707, 211 N.W.2d 88, 96 (Mich.App.1973) (statements made by counsel in closing argument may not be error if given in response to arguments made by opposing counsel).

Dura's argument presents a close question. The propriety of references to the disposition of prior cases must be distinguished from the propriety of references to the incidents which generated such litigation. Evidence of prior or subsequent accidents is relevant to, and may be admissible in, personal injury actions to demonstrate that a defective or dangerous condition existed, provided the incident took place

under similar circumstances and their probative value is not outweighed by considerations set forth in Alaska R. Evidence 403. *Johnson v. State,* 636 P.2d 47, 57–58 (Alaska 1981); *Caterpillar Tractor Co. v. Beck,* 624 P.2d 790, 794 (Alaska 1981). Thus, the opening remarks by Harned's counsel can be viewed as proper and not having opened the door for the statements of Dura's counsel, because Harned's counsel made no reference to prior litigation. *See* C. McCormick, *supra,* § 57.

9. We note that the Code of Professional Responsibility DR 7–106, provides in relevant part:

(C) In appearing in his professional capacity before a tribunal, a lawyer shall not:

(1) State or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence.

Further, the Code of Professional Responsibility EC 7–25, states, in relevant part:

a lawyer should not make any prefatory statement before a tribunal in regard to the purported facts of the case on trial unless he believes that his statement will be supported by admissible evidence . . . .

10. Harned intended to pursue the excluded line of questioning in order to rebut Mr. Oldham's anticipated testimony. At that point, Dura indicated it would not call Mr. Oldham, and the court apparently excluded as irrelevant Harned's questions regarding prior litigation.

concluded that the standard instruction informing the jury that "[s]tatements and arguments of Counsel are not evidence in the case" would cure any alleged harm caused by the questioned remarks of Dura's counsel made during öpening argument.

In light of his diligent efforts to introduce evidence to rebut Dura's statement regarding the disposition of prior litigation, we are persuaded that Harned's failure to raise an immediate objection to the questioned statements did not constitute a "waiver" of this claim.[11] As to the merits of this specification of error we conclude that Harned's proffered rebuttal testimony and final argument was improperly excluded. As we observed in *Patricia R.,* "there are circumstances in which the introduction of inadmissible evidence requires responding evidence . . . ." 631 P.2d at 97.[12] The remark made by Dura's counsel was potentially misleading and referred to evidence which was irrelevant and possibly prejudicial. Although Harned did not make an offer of proof regarding the content of the testimony excluded by the superior court's ruling, it is apparent that it bore upon the disposition of prior cases arising from explosions of Electro-Magic tanks. Under the circumstances, however, the testimony or argument should have been allowed under the doctrine of "curative admissibility." [13]

Nevertheless, we hold that the exclusion of Harned's rebuttal evidence and argument is not sufficiently prejudicial to warrant reversal. *McCracken v. Davis,* 560 P.2d 771, 774–75 (Alaska 1977); *Sloan v. Atlantic Richfield Co.,* 541 P.2d 717, 722 n. 9 (Alaska 1975). As we held in *Martinez v. Bullock,* 535 P.2d 1200, 1206–07 (Alaska 1975), if the error did not significantly affect substantial rights it is harmless and the judgment on the verdict should be affirmed in accordance with Alaska R.Civ.P. 61.[14]

---

11. Dura's argument that this specification of error should be deemed waived is supported by citations to cases in which objections to evidence were first raised at the conclusion of trial or on appeal. *See, e.g., Heacock v. Town,* 419 P.2d 622, 623 (Alaska 1966); *Ahlstrom v. Cummings,* 388 P.2d 261, 262 (Alaska 1964); *Thomson v. Wheeler Construction Co.,* 385 P.2d 111, 115 (Alaska 1963). The purpose of this rule is:

> to facilitate the administration of justice by permitting the trial judge to obviate any error that might otherwise occur if no objection were made, by permitting him to correct at the earliest possible time any error that may have occurred, and by allowing the adverse party the opportunity to remedy, if possible, any defect in his method of proof.

*Thomson,* 385 P.2d at 115. The rationale for the waiver rule renders it inapplicable in this case. At two or more points during trial, Harned drew the superior court's attention to his objection to counsel for Dura's opening remarks. Harned did not take his chances with the jury, rather he accorded the trial court ample opportunity to remedy the allegedly prejudicial effect of counsel for Dura's argument. Thus, we reject Dura's contention that this specification of error should be deemed waived.

12. *See also Cook v. Latimer,* 274 Ala. 283, 147 So.2d 831, 833–35 (Ala.1962).

13. *See supra,* note 8.

14. Alaska R.Civ.P. 61 provides:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

In *Martinez,* we quoted approvingly from *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), in which the United States Supreme Court set out its approach to applications of the doctrine of harmless error:

> It comes down on its face to a very plain admonition: "Do not be technical, where technicality does not really hurt the party whose rights in the trial and in its outcome the technicality affects.". . .
>
> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.

328 U.S. at 750, 760, 764–65, 66 S.Ct. 1239, 1245, 1247–48, 90 L.Ed. 1557, 1564, 1566–67.

The question of whether or not the erroneous exclusion of Harned's rebuttal evidence was "harmless" should not be decided by mechanistic formulae.[15] Our conclusion that the error was harmless rests on the fact that a week intervened between opening arguments and submission of the case to the jury for deliberation. During that period, the jury heard several days of testimony from numerous witnesses. Throughout this testimony no further mention was made regarding prior litigation, nor was the questioned statement reiterated by Dura's counsel during closing argument. Of further significance is the fact that the jury was specifically instructed it was "to consider only the evidence in the case" and that "[s]tatements and arguments of Counsel are not evidence in the case." Thus we think it unlikely that the jury ignored all the testimony which was produced as well as the trial court's admonition, and reached its decision on the basis of an ambiguous remark made by Dura's counsel in his opening argument. Under these circumstances, we conclude that Harned was not substantially prejudiced by the exclusion of rebuttal evidence or argument he sought to make. Therefore we hold that the superior court's ruling did not constitute prejudicial error.

## NONCOMPLIANCE WITH THE DESIGN STANDARDS OF THE AMERICAN SOCIETY OF MECHANICAL ENGINEERS WAS NEGLIGENCE PER SE

Dura conceded at trial that the tank which exploded and injured Harned did not comply with applicable design and construction standards set out in the American Society of Mechanical Engineers (ASME) Code.[16] The Code had been incorporated by reference into Alaska law at the time the tank was manufactured.[17] Relying on our

**15.** *See Martinez*, 535 P.2d at 1206, quoting *Love v. State*, 457 P.2d 622, 629 (Alaska 1969).

**16.** Report of the Subcommittee of the Boiler and Pressure Vessel Committee, The American Society of Mechanical Engineers, *ASME Boiler and Pressure Vessel Code Section VIII, Rules for Construction of Unfired Pressure Vessels* (1959). The court ruled that the relevant version of the ASME Code was that published in 1959 and in effect between 1961 and 1963, the period of time the tanks were manufactured by Electronics, Inc. Pertinent portions of the ASME Code state:

> UG–25 Corrosion (a) Vessels or parts of vessels subject to thinning by corrosion, erosion, or mechanical abrasion shall have provision made for the desired life of the vessel by a suitable increase in the thickness of the material over that determined by the design formulas, or by using some other suitable method of protection....
> (e) *Openings for Drain* Vessels subject to corrosion shall be supplied with a suitable drain opening at the lowest point practicable in the vessel; or a pipe may be used extending inward from any location to within ¼ inch of the lowest point.

VIII ASME Code 8–9 (1959).

> UG–27 Thickness of Shells Under Internal Pressure (a) The thickness of shells under internal pressure shall be not less than that computed by the following formulas. [Footnote omitted.] . . .
> (b) The notations defined below are used in the formulas of this paragraph.

> t = minimum required thickness of shell plates, *exclusive of corrosion allowance* (see Par. UG–25), inches, . . .

VIII ASME Code 9 (1959) (emphasis added).

**17.** The ASME Code was approved by the Alaska Territorial Legislature as a standard for the construction and operation of unfired pressure vessels. Ch. 132, § 1(c), SLA 1955, 1949 A.C.L.A. § 40–16–1(a)(1) (Equity Cumulative Supp. 1958). Accordingly, the ASME Code was adopted by the Board of Boiler Rules on October 26, 1955. Alaska Administrative Code, Register 22, pp. 8–94, 8–134 (November 1966). After statehood, the Department of Labor ratified the ASME Code pursuant to authority delegated under AS 18.60.180. 8 AAC 80.010(a).

AS 18.60.180, which has not been amended since 1955, provides:

> The Department of Labor shall formulate definitions, rules and regulations for the safe and proper construction, installation, repair, use and operation of boilers and for the safe and proper construction, installation and repair of unfired pressure vessels. The definitions, rules and regulations shall be based upon and shall follow the generally accepted nationwide engineering standards, formulae, and practices established for boiler and unfired pressure vessel construction and safety. *The Department of Labor may adopt the existing published codification of these definitions, rules and regulations, known as the Boiler Construction Code of the American Society of Mechanical Engineers,* and may adopt the amendments and interpretations made and published by that society. The

decision in *Ferrell v. Baxter,* 484 P.2d 250 (Alaska 1971), Harned requested a jury instruction stating that a violation of the ASME standard constituted negligence per se.[18] The superior court rejected this instruction, advising the jury that noncompliance by Dura should be deemed "mere evidence" of negligence and that, as the parties had stipulated, the ASME Code had not been adopted in South Dakota until 1974.[19]

In this appeal Harned argues that the jury should have been instructed that a violation of the ASME Code by Dura constituted negligence per se. The superior court refused to give a negligence per se instruction because the ASME Code had not been

> Department of Labor shall adopt amendments and interpretations to the code immediately upon their promulgation by the American Society of Mechanical Engineers so that the definitions, rules and regulations at all times follow generally accepted nationwide engineering standards.

(Emphasis added.) The Boiler Construction Code in effect between 1961 and 1963 provided, in relevant part:

Introduction, p. 8–94:

> The Board of Boiler Rules was authorized to adopt the codification of practices established and pertaining to boiler and unfired pressure vessel construction and safety known as the Boiler Construction Code of the American Society of Mechanical Engineers, with the amendments and interpretations thereto made and approved by the Council of the Society. Pursuant to the authority granted, the Board adopted The Boiler Construction Code of the American Society of Mechanical Engineers (October 26, 1955).

Section 4586, p. 8–124:

New installations—unfired pressure vessels.

(1) Requirements.

> (1) No unfired pressure vessel except reinstalled vessels and those exempt by these Rules and Regulations, shall hereafter be installed in this State unless it has been constructed, inspected and stamped in conformity with Section 8 of the A.S.M.E. Boiler Construction Code and is approved, registered and inspected in accordance with the requirements of these Rules and Regulations.

Authority, p. 8–134:

> Authority. SLA 1955, Ch. 132, sec. 1(c). History. In effect on and before July 28, 1959, effective date of Alaska Administrative Procedure Act. Approved by the Board of Boiler Rules October 26, 1955.

Alaska Administrative Code, Register 22 (November 1966).

At trial, Dura contended that the law of South Dakota, where the tank was allegedly manufactured, should govern the court's determination of the applicable standard of due care. Since the ASME Code was not incorporated into the law of South Dakota until 1974, the choice of law issue was critical. However, on appeal Dura concedes that Alaska law in effect between 1961 and 1963, when the tank which caused the injury was allegedly manufactured, should be applied to determine the appropriate standard of due care.

**18.** In *Ferrell* we adopted the rule of negligence per se found in the Restatement (Second) of Torts §§ 286, 288A, and 288B (1965). 484 P.2d at 263. We held in *Ferrell* that "the law allegedly violated must be applicable to the situation. If the law is adopted by the court as providing a fair and just standard of reasonable behavior and the violation is not excused, the violation will be negligence per se." 484 P.2d at 264. In *Bachner v. Rich,* 554 P.2d 430, 440–41 (Alaska 1976), we specifically extended *Ferrell* to violations of safety regulations adopted by the Department of Labor. *See also Northern Lights Motel, Inc. v. Sweaney,* 561 P.2d 1176, 1185 (Alaska 1977) (negligence per se applicable to violations of the Uniform Building Code, incorporated by reference into the Alaska Administrative Code).

**19.** The court instructed the jury as follows:

> The American Society of Mechanical Engineers Boiler and Pressure Vessel Code, Section VIII, deals with the construction of pressure vessels. The code itself is not a mandatory or self-enforcing code. The failure of the tank to meet the American Society of Mechanical Engineers Boiler and Pressure Vessel standards cannot be considered as conclusive evidence that the manufacturer was negligent. However, you may consider these standards in determining whether the Defendant negligently designed the tank. That is, you may consider whether the Defendant should have followed these standards or ones similar to them when it designed the tank, and whether failure to follow such standards was a lack of due care.
>
> The parties have stipulated that the American Society of Mechanical Engineers Boiler and Pressure Vessel Code, Section VIII, Rules for Construction of Unfired Pressure Vessels was not adopted into the law of South Dakota until 1974.

The superior court had previously instructed the jury that:

> When . . . the attorneys of both sides stipulate or agree as to the existence of a fact, the Jury must, unless otherwise instructed, accept the stipulation and regard that fact as proved.

adopted by South Dakota at the time the tank was manufactured.[20] Harned notes that before this court Dura now concedes that the superior court erred in its resolution of the conflict of laws question and that it should have looked to the law of Alaska to define the appropriate standard of care rather than to the law of South Dakota. In turn, Dura advances two alternative theories upon which it contends that the superior court's refusal to give a negligence per se instruction can be sustained.[21]

In assessing the merits of Harned's contention that the superior court erred in refusing to instruct the jury that a violation of the ASME Code would constitute negligence per se, we have applied the analytical scheme set out in *State Mechanical, Inc. v. Liquid Air, Inc.*, 665 P.2d 15 at 18–19 (Alaska 1983). As we observed in *State Mechanical*, the superior court should conduct a two-step inquiry in determining whether a negligence per se instruction is appropriate. First, it must decide whether the conduct at issue lies within the ambit of the statute or regulation in question, by applying the four criteria set out in the Restatement (Second) of Torts § 286 (1971).[22] This threshold determination is strictly a legal conclusion, and we will exercise our independent judgment in deciding whether the superior court interpreted the scope of the statute or regulation correctly. *See State Mechanical* at 19.

Once it has concluded that the enactment applies to the allegedly negligent conduct, the superior court may exercise its discretion to refuse to give the negligence per se instruction. Such discretion is extremely limited, being confined to those "highly unusual cases" in which "laws may be so obscure, oblique or irrational that they could not be said as a matter of law" to provide an adequate standard of due care, *Ferrell v. Baxter*, 484 P.2d at 260, or to those where the enactment amounts to little more than a duplication of the common law tort duty to act reasonably under the circumstances. *Bailey v. Lenord*, 625 P.2d 849, 856 (Alaska 1981); *Northern Lights Motel, Inc. v. Sweaney*, 561 P.2d 1176, 1183 (Alaska 1977); *Bachner v. Rich*, 554 P.2d 430, 440–42 (Alaska 1976). The superior court's disposition of the question of whether the enactment was too vague or arcane to be utilized as a reasonable standard of care will only be reversed on appeal if it constitutes an abuse of discretion. *See State Mechanical* at 19.

■ Applying this analysis to the case at bar, we conclude that the trial court erred in declining to instruct the jury that Dura's failure to manufacture the tank in accordance with ASME standards constituted negligence per se. Our threshold determination that the ASME code governed Dura's conduct in manufacturing the tank which exploded and injured Harned, was based on

**20.** Harned contends "that was the only objection to the application of the negligence per se rule which was raised, briefed or argued below."

**21.** In *Ransom v. Haner*, 362 P.2d 282, 285 (Alaska 1961), this court stated:

In this connection the defendants argue that, if there are any grounds for upholding the summary judgment on their behalf, regardless of whether they are the grounds set forth by the trial judge, the judgment should be affirmed. We agree, for it is a rule of law that an appellee may urge, and the appellate court should consider in defense of a decree or judgment any matter appearing in the record, even if rejected below and even if appellee's argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.

(Footnote omitted.) *See also Rutherford v. State*, 605 P.2d 16, 21 n. 12 (Alaska 1979); *A & G Construction Co. v. Reed Bros. Logging Co.*, 547 P.2d 1207, 1211 n. 1 (Alaska 1976).

**22.** Section 286 of the Restatement (Second) of Torts (1971) provides:

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the type of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

We adopted these principles in *Ferrell v. Baxter*, 484 P.2d 250, 263 (Alaska 1971).

an independent analysis under § 286 of the Restatement (Second) of Torts of the scope of pertinent statutory and regulatory provisions. Dura concedes on appeal that Alaska law should be applied to determine the applicable standard of care, and does not contest the fact that the ASME Code was incorporated by reference into Alaska law at the time the tank was manufactured, *see supra* note 17. However, Dura claims that the legislature did not intend to regulate the manufacture of pressure vessels under AS 18.60.180–.395 and that Harned was not within the class of persons protected by those provisions. We have recast and considered these contentions within the analytical framework delineated by the Restatement.

Dura's principal argument is that the "hazard" which the legislature intended to prevent by enacting these provisions was the installation and utilization—not the manufacture—of unfired pressure vessels which did not comply with the ASME Code. Thus, Dura concludes, a negligence per se instruction would have been inappropriate under § 286(d) of the Restatement. *See supra* note 22. In support of this contention, Dura cites numerous provisions within AS 18.60.180–.395 which specifically regulate only the installation and operation of boilers and unfired pressure vessels.[23]

We find this argument without merit. AS 18.60.180, the introductory provision which expressly enables regulatory authori-ties to adopt the "Boiler Construction Code," specifically commands them to formulate "rules and regulations for the safe and proper construction of unfired pressure vessels."[24] The Code itself was clearly promulgated to establish nationwide construction standards. *See* provisions set out *supra* at note 16. Dura's contention that the utilization, but not the manufacture, of unfired pressure vessels is subject to AS 18.-60.180–.395 is patently illogical. How can the manufacture of unsafe vessels be permissible if their utilization is not. Thus, we conclude that the manufacture of vessels whose design does not conform to standards set out in the ASME Code is the type of "hazard," for purposes of § 286(d), which the legislature intended to curtail by enacting AS 18.60.180–.395.

Dura's second argument against the propriety of a negligence per se instruction rests upon § 286(a). Dura contends that the tank which injured Harned fell within the exemption set forth in former AS 18.-60.210(a)(5), *amended by* 1981 SLA ch. 21 § 1, for "unfired pressure vessels having a volume of five cubic feet or less when not located in places of public assembly" and that Harned was not within the "class" of persons protected by the statute since he was not working in a "place of public assembly" at the time the explosion occurred. It is uncontroverted that the tank which exploded and injured Harned had a capacity of somewhat under 1.18 cubic feet.[25] How-

23. Dura observes that AS 18.60.200 pertains to the installation and operation of unfired pressure vessels, providing that:

[a] power boiler, low pressure boiler, or unfired pressure vessel which does not conform to the rules and regulations promulgated by the Department of Labor governing new construction and installation shall not be *installed* and *operated* unless it is of special design or construction, or is not in any way inconsistent with the rules and regulations, in which case the Department of Labor may issue a special *installation* and *operating* permit.

(Emphasis added.) Similarly, AS 18.60.220(3) directs the Department of Labor to "take action necessary for the enforcement of the laws, and rules and regulations governing the *use* of boilers and unfired pressure vessels." (Emphasis added.) Finally, AS 18.60.390 provides:

It is unlawful for a person to *operate* a boiler or unfired pressure vessel under pressure without a valid inspection certificate . . . . The *operation* of a boiler or unfired pressure vessel without an inspection certificate . . . is a misdemeanor and the *owner, user,* or *operator* is punishable by a fine of not more than $1,000 or by imprisonment for not more than six months, or by both. Each day of unlawful operation is a separate offense.

(Emphasis added.) These provisions have been in effect in Alaska, without amendment, since 1955.

24. AS 18.60.180 is set out in full *supra* at note 17.

25. The volume of the tank which injured Harned cannot be ascertained precisely, since it is now in several irregular pieces. However, according to the testimony of Harned's expert

ever, considerable dispute exists regarding the question of whether or not the A & M Motors repair shop was a "place of public assembly" for purposes of AS 18.60.-210(a)(5).

We do not find it necessary to reach this issue since we conclude that manufacturers should not be permitted to rely upon AS 18.60.210(a)(5). Manufacturers have a duty under AS 18.60.180 and 8 AAC 80.010(a) to construct pressure vessels in accordance with ASME standards. As a rule, they have no control over where the tanks they produce will be utilized. From Dura's standpoint, it was a fortuity that this vessel arguably fell within the scope of AS 18.60.-210(a)(5).[26] Dura's duty to comply with ASME construction standards arose during the manufacture of the tank in question; it should not be diminished retrospectively because it happened to be utilized at A & M Motors. Thus, Dura did have a duty to Harned under § 286(a) to manufacture the tank in accordance with the ASME Code, regardless of where he was at the time the explosion occurred.

Therefore, we conclude as a matter of law that under AS 18.60.180–.395 and 8 AAC 80.010(a) Dura was impressed with a duty to manufacture the tank in question in accordance with ASME standards.[27] Furthermore, we find it unnecessary to permit the superior court on remand to use its discretion to decide whether the ASME Code was too obscure, vague or arcane to serve as an appropriate standard of care. As it is both extremely precise and nationally recognized we conclude, as a matter of law, that it should be adopted as the relevant standard of care on retrial.[28]

REVERSED and REMANDED for a new trial.

BURKE, Chief Justice, concurring.

I disagree with the holding that the trial court erred in refusing to allow Harned's counsel to rebut the remark made by opposing counsel in his opening statement, alluding to other cases in which juries had found Dura not negligent. As I see it, the court did not err in ruling as it did. Thus, I see

---

witness, the tank which exploded had been similar in appearance to a tank introduced as an exhibit during trial. Exhibit 6 was roughly cylindrical and tapered towards its circumferential edge. Its maximum dimensions were eighteen inches (diameter) by eight inches (depth), generating a cylinder with a volume of 1.18 cubic feet. Its actual volume was less than 1.18 cubic feet, since the sides were tapered.

**26.** No contention is made that Dura intended the tank to be used only in places other than of public assembly, nor is it contended that the tank contained some notice alerting potential users that it was not for use in places of public assembly.

**27.** Dura does not contend that the statutory and regulatory provisions in question were not intended to protect against the type of physical injury which Harned suffered, and we find that no persuasive argument to that effect could be made under the circumstances. Thus, the criteria set out in § 286(b) and (c) are indisputably met here.

**28.** Our discussion of the propriety of a negligence per se instruction has been predicated

upon Dura's concession on appeal that Alaska law governs the resolution of this issue. *See supra* note 17. Should Dura choose to litigate the choice of law issue on remand, the superior court would not necessarily be bound to instruct the jury on negligence per se, since the discussion herein presupposes the applicability of Alaska law.

However, regardless of the resolution of the choice of law issue, we note that it was reversible error for the superior court to instruct the jury that the ASME code was not incorporated into the law of South Dakota until 1974, and caution that such an instruction should not be given on remand. This reference to the law of South Dakota impermissibly conveyed the impression to the jury that Dura was under no obligation to comply with the ASME code at the time it designed and manufactured the tank. Given that the jury had before it evidence that the air tank was manufactured in South Dakota between 1961 and 1963, we think it probable that the reference to the 1974 adoption of the ASME Code emasculated the evidence of negligence instruction, and thus cannot be regarded as harmless error.

no need to discuss whether it was harmless error. If we must do so, however, I agree that it was.

The rationale used to reach the conclusion that the "error" was harmless, convinces me that it was not error at all. This rationale is, in fact, quite like Judge Rowland's explanation of his reasons for ruling as he did. Further evidence or argument in response to counsel's improper statement, in all probability, would have only made matters worse. On balance, I fail to see how it can be fairly said that Judge Rowland abused his discretion.

In all other respects, I concur.