**DURA CORPORATION, Appellant,**

v.

**Charles HARNED and Providence Washington Insurance Company of Alaska, Appellees.**

**No. S–445.**

Supreme Court of Alaska.

July 19, 1985.

Rehearing Denied Aug. 14, 1985.

Mary Louise Molenda and Timothy M. Lynch, Lynch, Farney & Crosby, David H. Thorsness and Kenneth P. Jacobus, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellant.

Mark A. Sandberg and Henry J. Camarot, Camarot, Sandberg, Hunter & Smith, Anchorage, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This case involves a personal injury claim by Charles Harned against Dura Corporation, a manufacturer of portable air tanks, based on strict liability in tort and negligence. At the close of evidence, the superior court directed verdicts against the manufacturer on the issues of negligence per se, defective product, superseding cause, comparative negligence and proximate cause. The jury then found that Dura manufactured the air tank and assessed damages. Dura appeals the directed verdicts on superseding cause, comparative negligence, and proximate cause, and also claims that the trial court should have directed a verdict on the issue of brain damage. In addition, Dura contends that the trial court erred in several evidentiary rulings, in denying its motion for a new trial or remittitur and in its award of attorney's fees. We affirm the decision of the superior court.

## I. FACTS AND PROCEEDINGS

Charles Harned, an employee of A & M Motors, was filling a small portable tank with air from a compressor outlet when the tank suddenly exploded and severed his left arm at the elbow. In this trial, the jury found that Electronics, Inc. manufactured the portable air tank under the Electro-Magic brand label. Dura acquired Electronics, Inc. in 1964 and admits liability for torts committed by its predecessor.

This appeal follows a retrial of the case after we reversed and remanded it in *Harned v. Dura Corporation*, 665 P.2d 5 (Alaska 1983). In *Harned*, we stated that Alaska law incorporated by reference the applicable design and construction standards for pressure vessels set out in the American Society of Mechanical Engineers (ASME) Code. *Id.* at 10 n. 17. Consequently, the ASME Code established the statutory standard of care for Dura's construction of pressure vessels under Section 286 of the Restatement (Second) of Torts (1971).[1] *Id.* at 14. Since the trial judge

---

1. Section 286 of the Restatement (Second) of Torts (1971) provides:

    The court may adopt as the standard of conduct of a reasonable [person] the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

    (a) to protect a class of persons which includes the one whose interest is invaded, and

had not given a negligence per se instruction to the jury, we remanded the case for a new trial.

In the new trial, Harned claimed that Dura caused his injury by negligently manufacturing the pressure tank. He also alleged that Dura was strictly liable in tort based on its defective design and manufacture of the tank.

Electronics, Inc., Dura's predecessor in interest, manufactured portable tanks for compressed air for several years in the early 1960s. The tank consisted of two separate pieces welded together to form an aspirin shape. Wendell Shouse, a part-time Electronics employee who tested the tanks, stated that no one actually designed the tank for public use. Instead, someone probably welded the two pieces together for convenient use in the manufacturing plant and later sold the product to the public as a portable air tank. To Shouse's knowledge, no blueprint existed for the tank.

Both Harned and Dura presented expert testimony about the cause of the accident. Harned's expert, Dr. Taggart, testified that Dura originally manufactured the tank too thin to withstand its intended pressure of 150 pounds per square inch (psi). The tank's thin material violated the ASME Code. When the tank was filled with air, moisture also entered the tank and began to corrode the tank, making it thinner. The tank failed at the bend (the "knuckle") because at that point the stress was highest and the corrosion worst. When a crack gradually formed at the knuckle, the tank could not sustain the force of the compressed air. The force of the escaping air split the tank's two pieces apart and blew the halves a considerable distance.

Dura's expert, Dr. Selz, testified that low-cycle fatigue caused the tank failure. Low-cycle fatigue occurs when a tank is pressurized beyond the steel's yield strength. When its yield strength is ex-ceeded, steel will not return to its original shape but instead acts like "taffy with a spring inside. It comes back but not quite all the way." Because A & M Motors pressurized and depressurized the tank many times, cracks grew in the steel and caused the explosion. Dura asserted that the tank was intended only for emergency use. Dr. Selz testified that despite the tank's thinness, it would not have failed under its intended infrequent use.

Dr. Taggart also addressed the issue of low-cycle fatigue. In his opinion, low-cycle fatigue did not cause the tank failure. If the steel were stressed by the cycle of pressurization, corrosion would also occur due to the air's moisture. Since corrosion would destroy the tank before low-cycle fatigue caused any crack, corrosion would be the predominant or "rate controlling" process. Taggart also stated that thickening the steel would lessen the problem of low-cycle fatigue and corrosion. On cross-examination, Dr. Selz agreed that the problem of low-cycle fatigue could be avoided by building a thicker air tank. He also stated that corrosion caused the tank to fail sooner than it would have under low-cycle fatigue.

The two experts also testified about other violations of the ASME Code. Dr. Selz stated that the tank's shape did not comply with code standards. The tank that injured Harned also lacked an identification nameplate required by the code. The nameplate should contain the manufacturer's name, the maximum designed pressure and temperature, a serial number and the year of manufacture. The code also requires a manufacturer to "hydrotest" a pressure vessel to one and one-half times the designed pressure. In a hydrotest, the tank is filled with water and observed for a defect as pressure is applied to determine the tank's working pressure. The portable tank was originally designed for use at 140 psi and its safety valve was set at 150 psi.

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the type of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results. We adopted these principles in *Ferrell v. Baxter,* 484 P.2d 250, 263 (Alaska 1971).

During a hydrotest, Wendell Shouse noted some deformation in Dura's pressure tanks at 200 psi when the tanks were new. Dr. Taggart testified that Dura should never have sold these tanks to the public, because they failed the code's hydrotest.

Dr. Taggart stated that the ASME Code required that air tanks subject to corrosion be supplied with a drain valve at the lowest practicable point to empty accumulated moisture. In his opinion, Dura's failure to provide the tank with a drain valve violated the code. Dr. Selz believed that the tank could be emptied by inverting it and forcing the water out of the valves on the tank's top. He thought it would be poor design practice to add another opening to the tank.

Dura claims that it affixed a decal on its portable air tanks when the air tanks left the factory. The tank that injured Harned had no identification label. Harned suggests that Dura may have placed labels only on a different model tank. Harned's expert, Dr. Taggart, stated that the tank's label should be brazed or soldered into position. A gummed label such as Dura's decal would wear off. In any event, Dura's label stated:

Electro Magic Emergency Air Tank

Used by Farmers, Garages, Service Stations

Safety Valve set at 150 lbs.

Electronics, Inc., Vermillion, So. Dak. It is undisputed that Dura's label failed to comply with the ASME Code because it did not list the year of manufacture, the maximum designed temperature or a serial number.

Dura sought to show that A & M Motors' misuse of the air tank caused the accident. Winston Chance, A & M Motors' owner, obtained the tank in used condition sometime between 1963 and 1967. Al Chance, A & M Motors' service manager, and Winston Chance, Jr., the business manager, both testified that the portable air tank was never inspected. The tank's safety relief valve was never tested and A & M personnel never drained the tank. In addition, neither Harned nor any of the Chances

recalled seeing a pressure gauge on the tank.

Al Chance testified also that the portable air tank had no drain. Since the tank lacked a drain, he never knew that it needed to be drained. He did drain a large compressor tank at A & M once or twice per week. Chance also testified that a pressure gauge on the tank would have been useless without an information plate stating the tank's maximum pressure.

After the close of testimony, Harned moved for a series of directed verdicts: on the issue of negligence per se based on the ASME Code violations, on the issue of product defect, on superseding cause, on comparative negligence, on the issue of the identity of the tank's manufacturer, and on proximate cause. Dura moved for a directed verdict on the issue of brain damage. The superior court ruled that Dura was negligent per se because of four violations of the ASME Code: (1) the thinness of the tank, (2) its inappropriate shape, (3) the failure to hydrotest, and (4) the lack of an information plate. The superior court also ruled that the tank was defective and that the defect caused Harned's injury. Although the court denied a directed verdict on the tank's identity and on the issue of brain damage, it granted directed verdicts on the issues of proximate cause, superseding cause and comparative negligence.

After the jury found that Dura manufactured the tank that caused Harned's injury, it returned a verdict for Harned and awarded him $2,161,000 in compensatory damages. Dura's motion for a new trial and entry of remittitur was denied. The court also granted $348,264 in attorney's fees to Harned pursuant to Civil Rule 82, and denied defendant's motion for reconsideration of its order.

Dura does not question the jury's finding that it manufactured the tank. While Dura does not directly contest the court's directed verdicts on the issues of negligence per se and product defect, it does challenge some evidentiary rulings regarding excuse of violations and admission of evidence. Additionally, Dura contends the superior

court erred in directing verdicts on the issues of superseding cause, comparative negligence and proximate cause.

## II. DIRECTED VERDICTS

### A. *Standard of Review*

■ In *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216 (Alaska 1978), we defined the standard of review regarding a motion for directed verdict.

> [T]he proper role of this court, on review of motions for directed verdict ... is not to weigh conflicting evidence or judge the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable men could not differ in their judgment.

The test is objective; and, if there is room for diversity of opinion among reasonable people, the question is one for the jury. Further, all favorable inferences are to be accorded the non-moving party.

*City of Whittier* at 220 (quoting *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974)) (footnotes omitted).

### B. *Superseding Cause*

■ Dura contends that A & M Motors' misuse of the tank and failure to maintain or inspect it amounted to a superseding cause of Harned's accident. The defense of superseding cause may apply in a strict products liability case. In *Yukon Equipment, Inc. v. Gordon*, 660 P.2d 428 (Alaska 1983), the manufacturer claimed that the purchaser's negligent maintenance and failure to inspect the brake system constituted a superseding cause. We stated that a superseding cause occurs when

> "after the event and looking back from the harm to the actor's negligent conduct, it appears to the court *highly extraordinary* that it should have brought about the harm." Restatement (Second) of Torts § 435 (1965). A resulting harm is extraordinary when it would not have occurred without the act of a third per-

son or other force following the defendant's negligence.

*Id.* at 433 n. 4 (emphasis added). In *Yukon*, we held that the trial court's failure to instruct the jury on superseding cause was not reversible error. The jury's determination that the manufacturer's design defect proximately caused the accident necessarily implied a finding that there was no superseding cause. *Id.* at 433.

■ An intervening cause that lies within the scope of the foreseeable risk, or has a reasonable connection to it, is not a superseding cause. For example, in *Morris v. Farley Enterprises, Inc.*, 661 P.2d 167 (Alaska 1983), it was foreseeable that the youth who illegally purchased liquor from the defendant's store would share it with his friends and that a drunk driving fatality could occur. Therefore, we held that no superseding cause existed as a matter of law and the trial court should not instruct the jury on this issue in the new trial. *Id.* at 170.

Another recent case discussing superseding cause is *Osborne v. Russell*, 669 P.2d 550 (Alaska 1983). In that case, Russell noticed some exposed electrical wires protruding out of a wall while he was working as an electrical contractor for a business. He did not insulate the exposed wires but instead turned off the breaker switch. Someone turned the switch on later. Osborne's employer, Lamoreaux, knew about the exposed wires but did not order his handyman to fix them. Osborne was electrocuted by the exposed wires.

■ On appeal, we held that Russell was negligent per se because he did not comply with the National Electrical Code. We also found that the trial judge erred when he instructed the jury on superseding cause.

> It would be incongruous to first conclude that Russell's failure to insulate, harmless in itself, constituted negligence as a matter of law, and then hold it is a jury question whether he is relieved of liability because the intervention which he negligently risked actually occurred.

*Id.* at 557. A finding of superseding cause means that the defendant's duty to prevent

harm to someone threatened by his negligent conduct shifts to a third person. We stated that this shift in duty occurs only in "exceptional cases" and *Osborne* was not one of those rare cases. *Id.* at 558.

■ In this case, Dura claims that A & M Motors overused its product which was intended only for occasional use of emergency air. This overuse led to low-cycle fatigue. On the issue of superseding cause, we find Dura's argument about intended use unpersuasive because it was not "highly extraordinary" that A & M Motors would frequently use the portable air tank. Dura's literature on the air tank explained that it had thousands of uses and could be used in service stations, airports and farms. Dr. Selz, Dura's expert, stated that the tank should have been designed for more frequent use for a service station and that he would not design a tank for infrequent use. Dr. Taggart testified that the ASME Code does not distinguish between emergency and non-emergency tanks. If Taggart designed a reusable air tank, he would assume it would be reused with frequency.

■ Dura claims that A & M Motors overpressurized the tank, but there is no indication that A & M could have known the tank's intended pressure. The air tank had no information plate stating its maximum designed pressure. Dura states that it placed a gummed label on its tanks with the tank's intended pressure. However, the label should have been brazed or soldered into position. Since a gummed label easily wears off, the eventual consumer is left with no information regarding the tank's working pressure.

■ Dura also asserts that A & M's failure to drain the tank was a superseding cause of the accident. The air tank lacked a drain valve and did not contain a warning to the consumer that it needed to be drained. Under these circumstances, it is reasonably foreseeable that a consumer would not drain the tank. Indeed, A & M's service manager, Al Chance, claimed he would have emptied the tank if there had been a drain valve.

■ The air tank was too thin to comply with the ASME Code on the day it was manufactured. The code provides a margin of safety to allow for factors such as corrosion or low-cycle fatigue. By not complying with the code's requirements, Dura risked that its tank would fail, due to either low-cycle fatigue or corrosion. The accident that occurred was within the scope of the foreseeable risk. In hindsight, it does not seem "highly extraordinary" that Dura's negligent conduct or defective product would cause this accident.

In *Osborne*, we rejected an instruction on superseding cause despite the employer's *actual* discovery of the exposed wires and failure to insulate them. In this case, A & M had no actual knowledge that the tank was defective. It would have been prejudicial error for the trial court to instruct the jury on superseding cause.

### C.  *Comparative Negligence*

■ Dura claims that Harned had previously worked with compressed air and knew that it was dangerous. Therefore, Harned was negligent because he continued to use the portable air tank without obtaining safety information or testing the tank. Comparative negligence may apply in personal injury cases based on strict liability in tort.

> The defense of comparative negligence is not limited to those cases where the plaintiff uses the product with knowledge of the defective condition, but also extends to those cases where the plaintiff misuses the product and that misuse is the proximate cause of his injuries.

*Butaud v. Suburban Marine & Sporting Goods, Inc.*, 555 P.2d 42 (Alaska 1976) (*Butaud II*).

In *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871 (Alaska 1979), we addressed the issue of comparative negligence in a product design defect case. Beck was killed while operating a front-end loader that rolled over an embankment. His widow claimed that the absence of a roll-over protective shield was a design defect that

caused his death. Caterpillar contended that Beck was comparatively negligent and that the jury should have been instructed on his general negligence as well as assumption of a known risk. We limited the defense of misuse of a product in strict liability in tort cases in the following manner:

> We do not believe that a consumer who uses a product as it was intended to be used, and who knows or should know of the lack of a safety device, can be deemed to have misused the product within the meaning of *Butaud II.* If a jury finds that a product is defective by virtue of its lack of a safety feature, plaintiff's failure to install such a device will not reduce his recovery based upon his mere knowledge of the inadequate safety features on the product.

*Id.* at 891.

■■■ We held that when a design defect is the lack of a safety device, the court should instruct the jury on comparative negligence only if the plaintiff (1) knowingly uses a defective product, and (2) voluntarily and unreasonably encounters

the known risk. *Id.* at 892.[2] Furthermore, the defendant bears the burden of proving the plaintiff's actual knowledge of the defect as part of its affirmative defense of comparative negligence. *Brinkerhoff v. Swearingen Aviation Corp.,* 663 P.2d 937, 940 (Alaska 1983).

In the present case, Dura never contended that Harned had actual knowledge of the tank's defects. Harned testified that (1) he had worked with compressed air in previous jobs, (2) he knew the purpose of a drain valve and a safety valve, and (3) he was aware that the portable tank did not have a pressure gauge. Based on these facts, Dura claims that Harned assumed the risk that compressed air is dangerous and that his use of the tank was unreasonable because he failed to obtain any further information on the tank's use.

■■■ Dura failed to prove that Harned had actual knowledge of the air tank's defect. *Brinkerhoff v. Swearingen Aviation Corp.,* 663 P.2d 937.[3] In fact, Harned knew that the large compressor tank, run by a motor, had a drain valve.

**2.** In *Prince v. Parachutes, Inc.,* 685 P.2d 83 (Alaska 1984), we held that plaintiff's subjective knowledge was not relevant to a manufacturer's duty to warn. However, we also stated that plaintiff's subjective knowledge could be relevant to the issue of comparative negligence in a products liability case, citing *Teagle v. Fisher & Porter Co.,* 89 Wash.2d 149, 570 P.2d 438 (1977). In *Teagle,* the court relied on the Restatement (Second) of Torts, § 402A, comment n (1965), which states in pertinent part:

> Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of *assumption of risk,* is a defense under this Section as in other cases of strict liability. *If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product* and is injured by it, he is barred from recovery.

(Emphasis added.)
We also noted the case of *Seay v. Chrysler Corp.,* 93 Wash.2d 319, 609 P.2d 1382 (1980), in which the court held that a plaintiff's mere negligence

would not reduce his award in a strict products liability action. *Prince,* 685 P.2d at 89 n. 2.

**3.** In *Brinkerhoff v. Swearingen Aviation Corp.,* 663 P.2d 937, Jet Alaska's plane was damaged when it rolled off the runway during takeoff. Swearingen asserted that Jet Alaska was comparatively negligent because it voluntarily and unreasonably continued to use the plane after its pilots encountered the steering problem in two previous incidents. Regarding the requirement of "knowledge of the defect," the jury instruction on comparative negligence stated: "it is sufficient if Jet Alaska knew of the effect the defect had on the operation of the aircraft, regardless of whether they knew the precise source or nature of the cause of such effect." We held that this jury instruction was correct because it required *actual subjective knowledge* by the plaintiff. "The fact that the knowledge component can be satisfied by awareness of the *effect* of the defect, as opposed to knowledge of the precise technical source or cause of that effect, merely emphasizes that a sophisticated scientific understanding of the mechanism is not a prerequisite." *Id.* at 941 (emphasis in original). *Brinkerhoff* is distinguishable from the present case because Harned never had actual subjective knowledge that the portable air tank was defective.

On the other hand, the portable air tank manufactured by Dura had no motor, was manually filled by an external source and had no drain valve. It is possible that Harned never knew the portable tank needed to be drained. Additionally, Harned could have reasonably relied on the tank's safety relief valve to release air if the tank had too much pressure. Since comparative negligence is limited to a plaintiff's voluntary assumption of a known risk in strict products liability cases, the trial judge was correct in directing a verdict for Harned.

In *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871, we stated that comparative negligence cannot be used in strict liability in tort cases when the plaintiff's negligence was nothing more than knowledge of the defect, especially when there is a large used-equipment market. "Were it otherwise, we would be resurrecting, *sub silentio,* the distinction between patent and latent defects which we abolished in *Butaud I.*"[4] *Id.* at 892. We stated that it would ignore economic reality to assume that many users would make safety alterations at their own expense.

*Beck*'s rationale clearly applies to this case. In *Beck,* the consumer knew that the front-end loader lacked a roll-over protective shield and still chose to use the loader without it. In this case, however, Dura's tank had no information plate to warn the consumer of the tank's proper working pressure. The tank lacked a drain valve, which could imply that it did not need to be drained. Additionally, the tank's structure was latently defective because its shape and thinness failed to comply with the

ASME Code. Harned's experience with compressed air does not rise to the level of comparative negligence. The superior court was correct in directing a verdict on this issue.[5]

## D. *Proximate Cause*

Harned alleged that Dura's air pressure tank was either defectively manufactured or designed. In this jurisdiction, a "manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." *Clary v. Fifth Avenue Chrysler Center, Inc.,* 454 P.2d 244, 247 (Alaska 1969) (quoting *Greenman v. Yuba Power Products, Inc.,* 59 Cal.3d 57, 27 Cal.Rptr. 697, 700, 377 P.2d 897, 900 (1962)). In moving for a directed verdict, Harned relied on *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871, in which we established two tests to determine a design defect.

[T]he trial court may instruct the jury that a product is defectively designed if:

"(1) The plaintiff proves that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or

(2) The plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors, that on balance the benefits of the challenged design outweigh

---

**4.** *Butaud I* refers to *Butaud v. Suburban Marine & Sporting Goods, Inc.,* 543 P.2d 209 (Alaska 1975).

**5.** In *Sturm, Ruger & Co. v. Day,* 594 P.2d 38 (Alaska 1979), *modified* 615 P.2d 621 (Alaska 1980), *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981), Day was unloading a revolver in his pickup truck when it slipped out of his hands. When he grabbed for the gun, it fired and injured his leg. Day contended that Sturm, Ruger defectively manufactured and designed the gun. The manufacturer claimed that Day was comparatively negligent by unloading his gun in the truck, failing to read directions

and accidentally dropping the gun. The trial judge ruled that Day was not negligent as a matter of law. We reversed, holding that it was a question of fact for the jury to decide whether Day was contributorily negligent. Two justices dissented, stating that there was no inference that Day was negligent. *Sturm, Ruger,* 594 P.2d at 49, 50.

To the extent that *Sturm, Ruger* is inconsistent with the present opinion, it is overruled. Plaintiff's failure to exercise ordinary care is not sufficient to raise a jury question on the issue of comparative negligence in a products liability case based on strict liability in tort.

the risk of danger inherent in such design."

*Id.* at 886 (quoting *Barker v. Lull Engineering Co., Inc.*, 20 Cal.3d 413, 143 Cal. Rptr. 225, 234, 573 P.2d 443, 452 (1978)).

In particular, Harned claimed that he satisfied the second test under *Beck* to establish a design defect by proving that the product's design proximately caused his injury. Moreover, Dura failed to offer any testimony regarding the benefits of the tank's design. In fact, Dura's expert, Dr. Selz, testified that he would not design a tank similar to Dura's tank.

The trial court granted a directed verdict on the product's defect, stating:

> [Harned is] also entitled to a directed verdict on the ... defect ... or product liability claim, in that I would find that fair-minded men in the exercise of reasonable judgment couldn't differ on that. That the tank which injured Mr. Harned was defective, and that such defect caused injury to Mr. Harned.

Dura did not appeal the court's ruling on the issue of defect but does contend that the court erred in directing a verdict on proximate cause because of unresolved factual issues.

■ Under the second *Beck* test, the plaintiff must establish a *prima facie* case by introducing sufficient evidence to permit a jury to find that the product's design features were a proximate cause of plaintiff's injury. Once the plaintiff has made this showing, the burden of proof shifts to the defendant. *Campbell v. General Motors Corp.*, 32 Cal.3d 112, 184 Cal.Rptr. 891, 895, 649 P.2d 224, 228 (Cal.1982). After the burden of proof shifts, the defendant may choose to offer evidence relevant to a risk-benefit evaluation of its product's design or it may attempt to refute the plaintiff's theory of causation. *Id.* 184 Cal. Rptr. at 899, 649 P.2d at 232. In this case, Dura chose to contest the issue of proximate cause.

■ A defendant's design defect will be the legal or proximate cause of the plaintiff's injury if the defective product was more likely than not a substantial factor in bringing about the plaintiff's injury. *Cf. Morris v. Farley Enterprises, Inc.*, 661 P.2d 167, 169 (Alaska 1983) (defining proximate cause in a negligence case). In the negligence context, we defined the "substantial factor" test as follows:

> [I]f two forces are operating to cause the injury, one because of the defendant's negligence and the other not, and each force by itself is sufficient to cause the injury, then the defendant's negligence may be found to be a substantial factor in bringing about the harm.

*State v. Abbott*, 498 P.2d 712, 727 (Alaska 1972). We have subsequently applied the substantial factor test in cases involving strict liability in tort. *See Yukon Equipment, Inc. v. Gordon*, 660 P.2d at 433 ("but for" causation instruction improper in a case involving strict liability in tort when either manufacturer's design defect or lessee's negligent maintenance of brake system would have been sufficient to cause plaintiff's accident).

■ The issue of proximate cause is normally a question of fact for the jury to decide and becomes a matter of law only where reasonable minds could not differ. *Sharp v. Fairbanks North Star Borough*, 569 P.2d 178, 183–84 (Alaska 1977).[6] For example, we reversed a summary judgment for the defendant on proximate cause in a strict liability case involving a duty to warn in *Prince v. Parachutes, Inc.*, 685 P.2d 83 (Alaska 1984). Although multiple factors could have contributed to Prince's accident, we could not hold as a matter of law that Parachutes' failure to warn was not also a proximate cause of the accident. *Id.* at 89.

In this case, Harned claims that the tank's thinness caused the accident in both his and Dura's theories of the accident. Dr. Taggart testified that the tank was too thin when it was manufactured and that

---

**6.** *See also Morris v. Farley Enterprises, Inc.*, 661 P.2d 167 (issue of substantial factor causation presented a jury question in a case where negligence and superseding cause issues were resolved as a matter of law).

corrosion made it even thinner, thus causing the tank's failure. Dr. Selz asserted that low-cycle fatigue cause the tank failure. However, Dura advertised that its tank had "thousands of uses." Dura claimed that its tank was suitable "for service stations, garages, farms, airports, truckers, etc." and that the tank was "absolutely durable ... drop it, kick it ... you can't hurt it!" Based on this advertising, it was reasonably foreseeable that a consumer would use the air tank frequently. Therefore, Dura should have designed the tank to prevent low-cycle fatigue. In fact, Dr. Selz testified that he would design a tank on the assumption that it would receive frequent fillings. Additionally, Dr. Selz admitted that a thicker tank would improve a tank's yield strength and reduce the possibility of stress fatigue. Based on this testimony, Harned claims that no reasonable person could conclude that the tank's thinness was unrelated to the explosion.

Dura argues that the trial court should not have directed a verdict because of unresolved factual issues. First, Dura claims that A & M Motors' failure to drain the tank caused the corrosion. According to Dr. Taggart, the lack of a drain valve in the tank violated the ASME Code. On the other hand, Dr. Selz believed it would be poor design practice to add another opening to the tank for drainage. The tank could be emptied by inverting it and forcing water out of the top valves. The trial court refused to rule as a matter of law that the absence of a drain valve in the tank violated the ASME Code, stating that this was an issue of fact for the jury.

Dura claims that the tank would not have corroded as it did if A & M Motors had drained the tank. It is undisputed that A & M personnel did not drain the tank. Despite this fact, the tank's corrosion could have amounted only to a concurrent cause of the accident. Dura's tank was too thin to withstand its intended air pressure on the day it left the factory. In addition, its shape, including a sharp bend or knuckle, violated ASME Code requirements. The explosion occurred at the tank's knuckle.

Under Dr. Selz's theory, low-cycle fatigue, attributable to frequent use, caused the accident. Such frequent use was foreseeable. If Dura had manufactured its tanks in compliance with the ASME Code, Dura could have prevented the problems of low-cycle fatigue and corrosion.

Second, Dura claims that it is a question of fact whether substantial alterations in the air tank proximately caused Harned's injury.

> [T]o the extent that an injury, caused by a substantially altered product, is the result of the product's alteration and not a result of a product "defect" existing at the time of manufacture, the manufacturer is not liable for the injuries.

*Hiller v. Kawasaki Motors Corp., U.S.A.*, 671 P.2d 369, 372 (Alaska 1983). In this case, A & M Motors probably obtained the air tank in used condition in the mid-1960s. The tank was missing a pressure gauge and no one from A & M recalled seeing a gauge on the tank. In addition, Dura claimed that the air tank's safety relief valve was preset at 150 pounds per square inch (psi). When OSHA tested the tank after the accident, the valve would not release at 230 psi. Dura asserts that the issue of alteration as the proximate cause of Harned's injury is a question of fact for the jury to decide.

Regarding the pressure gauge, Dura's tank lacked an information plate required by the ASME Code to indicate the tank's intended working pressure and temperature. Without an information plate, the pressure gauge would have been merely decorative and not useful to A & M Motors.

The facts indicate that the safety relief valve would not release at 230 psi after the accident. However, Dura designed the safety valve to be adjustable. While an adjustable safety valve did not violate the 1959 ASME Code, Dura's own expert, Dr. Selz, testified that he would not design an adjustable safety valve. Instead, he would place a lead seal on the safety valve to prevent faulty adjustment and possible injury. Moreover, Dura's tank had an in-

tended working pressure of 140 psi. The ASME Code requires a manufacturer to "hydrotest" a pressure vessel to one and one-half times the designed pressure. When Dura's portable air tanks were new, an employee noted some deformation at 200 psi during a hydrotest. Thus, Dura's portable air tanks violated the ASME Code before they were sold to the public.

■ A & M Motors' personnel filled the Dura portable tank from an air compressor. The air pressure in the compressor ranges from 140 psi to 180 psi. When the pressure reaches 180 psi, the compressor's motor stops and the pressure does not increase any further. Even assuming that the safety valve on Dura's portable tank had been readjusted to 230 psi *before* the accident, the portable tank could not have contained more than 180 psi. At the pressure of 180 psi, the portable air tank should not have exploded if Dura had built the tank in compliance with the ASME Code. Based on the facts in this case, the trial court did not err when it directed a verdict on the issue of proximate cause.

### E. *Issue of Brain Damage*

Harned's expert, Dr. Bissey, testified that Harned suffered a generalized impairment of the brain, particularly in the frontal area. Dura's expert, Dr. Severtson, concluded that Harned did not suffer any brain damage. Dura acknowledged that there is a question of fact whether Harned has suffered brain damage. However, Dura argued that Harned failed to establish that the tank's explosion proximately caused any such injury and moved for a directed verdict on this issue. The superior court denied Dura's motion for a directed verdict.

At the time of the accident, Dr. Newman performed emergency surgery on Harned's arm and was the attending physician during his subsequent hospital stay. During his physical examination of Harned, Dr. Newman observed no bleeding, scars or contusions other than Harned's arm injury. In addition, Harned did not complain of a head injury while in the hospital. Conse-

quently, Dura asserts there was no physical manifestation of Harned's head injury at the time of the accident.

On the other hand, Dr. Bissey testified that certain things get overlooked in emergency rooms when a patient arrives in acute distress. Additionally, Harned was given a significant amount of analgesics that could have masked symptoms of a head injury. Finally, physical findings of head injury may occur weeks after the actual injury. From this testimony, it is possible to conclude that Harned suffered a head injury.

On September 13, 1977, six weeks after the accident, Harned sought treatment from Dr. Dunn because of severe headaches behind his eyes. Dr. Dunn had treated Harned for ear problems since 1968. He testified that Harned could have suffered from a sinus infection that caused his headache. However, Dr. Dunn did not note any sinus problem in his records or any objective cause for the headache. He stated that a pain behind the eyes was very unusual. Obviously, Dr. Dunn's testimony is inconclusive on the issue of brain damage.

■ On a motion for directed verdict, we will not "weigh conflicting evidence or judge the credibility of witnesses." *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d at 220. The issue of proximate cause is normally a question of fact for the jury to decide. It becomes a matter of law only where reasonable minds could not differ. *Sharp v. Fairbanks North Star Borough*, 569 P.2d at 183–84. Reasonable people may differ on the issue whether the tank's explosion proximately caused brain damage to Harned. Since there was conflicting evidence on the issue of brain damage, the superior court correctly denied Dura's directed verdict on this issue.

### III. EVIDENTIARY ISSUES

#### A. *Alaska Regulations Adopted by the Board of Boiler Rules*

■ To be admissible, evidence must be relevant and tend to establish a material

proposition. *Bachner v. Rich*, 554 P.2d 430, 446 (Alaska 1976). The standard for appellate review of a trial court's decision on admissibility of evidence is whether the court abused its discretion. *Alaska Northern Development, Inc. v. Alyeska Pipeline Service Co.*, 666 P.2d 33, 42 (Alaska 1983). We will find that a trial court abused its discretion only "when we are left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling." *Peter Pan Seafoods, Inc. v. Stepanoff*, 650 P.2d 375, 378–79 (Alaska 1982).

When this case was previously before us in *Harned v. Dura Corporation*, 665 P.2d 5, Dura argued that the ASME Code was not the proper basis for a negligence per se instruction. Dura claimed:

> The tank which injured Harned fell within the exception set forth in former AS 18.60.210(a)(5)[7], amended by 1981 SLA ch. 21 § 1, for "unfired pressure vessels having a volume of five cubic feet or less when not located in places of public assembly" and that Harned was not within the "class" of persons protected by the statute since he was not working in a "place of public assembly" at the time the explosion occurred.

*Id.* at 13. While it was uncontroverted that the tank's capacity was under 1.18 cubic feet, the parties disputed whether A & M Motors' repair shop was a place of public assembly. Notwithstanding this dispute, we held that a manufacturer could not rely on the "public assembly" exemption. A manufacturer cannot control where the tank it produces will be used. "Dura's duty to comply with ASME construction standards arose during the manufacture of the tank in question; it should not be di-minished retrospectively because it happened to be utilized at A & M Motors." *Id.* at 14.

In the present case, Dura attempted to introduce Alaska regulations adopted by the Board of Boiler Rules under the authority of AS 18.60.180 to demonstrate that Alaska law required the owner of the pressure tank, A & M Motors, to maintain, inspect and hydrotest the portable air tank. However, Harned argued that the regulations were inadmissible because former AS 18.60.210(a)(5) exempted *owners* of tanks under 5 cubic feet. The superior court concluded that the Alaska regulations were inadmissible because of former AS 18.60.-210(a)(5).[8]

*Harned v. Dura* does not directly address the issue of an owner's duty under former AS 18.60.210(a)(5). Dura claims that the public policy reason of promoting safety is as compelling for owners as for manufacturers. However, we did not strike down AS 18.60.210(a)(5) in *Harned* and the statute's plain language exempts owners. In addition, the superior court provided a rational reason for treating manufacturers and owners differently, because their respective duties under the ASME Code arise at different times. The court reasoned that Dura's duty arose at the time of manufacture and it could not control where the tank would eventually be used. On the other hand, an owner of a small air tank could control the location of the tank so that it would not be in a place of public assembly. Therefore, we conclude that the trial court did not abuse its discretion when it ruled that the Alaska regulations were inadmissible.

> Sec. 18.60.210. EXEMPTIONS.
> (a) AS 18.60.180–18.60.390 do not apply to the following:
> ....
> (5) Unfired pressure vessels having a volume of five cubic feet or less or vessels having an inside diameter not exceeding six inches.

---

**7.** Former AS 18.60.210(a)(5) provided:
 Sections 180–390 of this chapter do not apply to the following:
 ....
 (5) unfired pressure vessels having a volume of five cubic feet or less when not located in places of public assembly.

**8.** Former AS 18.60.210(a)(5) was amended by 1981 SLA ch. 21 § 1, which provides in pertinent part:

### B. *Excuse of Violation of the ASME Code*

In *Harned v. Dura Corporation*, 665 P.2d 5, Dura contended at trial that the law of South Dakota should govern the court's determination of the applicable standard of due care, since the tank was manufactured in that state. On appeal, however, Dura conceded that Alaska law provided the applicable standard of care. *Id.* at 11 n. 17. In a footnote, we stated:

> [R]egardless of the resolution of the choice of law issue, we note that it was *reversible error* for the superior court to instruct the jury that the ASME Code was not incorporated into the law of South Dakota until 1974, and caution that such an instruction should not be given on remand. This reference to the law of South Dakota impermissibly conveyed to the jury that Dura was under no obligation to comply with the ASME Code at the time it designed and manufactured the tank.

*Id.* at 14 n. 28 (emphasis added).

In this case, Dura sought to introduce evidence that South Dakota law did not require compliance with the ASME Code at the time of the tank's manufacture. This evidence could establish an excuse for violating Alaska law under § 288(A)(2)(b) of the Restatement (Second) of Torts (1965), which provides: "Unless the enactment or regulation is construed not to permit such excuse, its violation is excused when ... *he neither knows nor should know* of the occasion for compliance." (Emphasis added.) Dura submitted an affidavit of Dr. Selz in lieu of an offer of proof.

■ The ASME Code is a nationally recognized safety code. Dura's predecessor sold Electro-Magic products such as the portable air tank through approximately 150 dealers in the lower 48 and had a dealer in Anchorage. Dura's expert, Dr. Selz, acknowledged that a product designer should try to identify all applicable safety codes before marketing a product. Harned offered proof that compliance with the ASME Code is possible despite the absence of a state code. It would be poor public policy to allow a manufacturer's ignorance of a national safety code to excuse its negligence or to relieve it from strict liability in tort. The superior court did not abuse its discretion when it ruled as a matter of law that such excuse was invalid.

### C. *Admission of Other Air Tanks into Evidence*

At trial, Dura objected on two grounds to the admission into evidence of Exhibits 3 and 5, two air tanks that had also exploded. First, Dura contended that Harned's expert could not testify that these tanks were used under "similar circumstances" as required by *Harned v. Dura*, 665 P.2d at 8 n. 8, in which we stated:

> Evidence of prior or subsequent accidents is relevant to, and may be admissible in, personal injury actions to demonstrate that a defective or dangerous condition existed, *provided the incident took place under similar circumstances* and their probative value is not outweighed by considerations set forth in Alaska R. Evidence 403.

(Emphasis added.) Second, Dura claimed that the proferred evidence's prejudicial effects outweighed its probative value. The superior court overruled Dura's objections, based on a showing that the tanks in Exhibits 3 and 5: (1) were made out of the same material, (2) had substantially the same design and similar welding, and (3) incurred the same kind of oxidation and deterioration. Exhibits 3 and 5 were relevant as evidence to show that a design defect led to the tank's failure.

■ On appeal, Dura maintains that misuse or poor maintenance proximately caused Harned's tank to explode. Since Dura's theory of causation for the failure of its tank involved the particular circumstances of the tank's use, Dura argues that evidence of the particular use of tanks 3 and 5 should be essential as a foundational requirement for their admission. We reject this argument because it is not necessary that Harned's evidence comply with Dura's theory of the explosion. Harned's expert planned to testify that all of these tanks

failed for the same reason, corroding at the bottom "knuckle" until they became so thin that they could not hold the air pressure. The similarity in design was relevant to Harned's theory of the accident. Under these circumstances, the superior court did not abuse its discretion by admitting the tanks into evidence.

### D. *Admission of Evidence of Dura's Attempted Recall*

██ In a products liability action, evidence of subsequent remedial measures is admissible to prove the feasibility of alternative designs as well as to prove a defective condition. Alaska R. Evidence 407; *Caterpillar Tractor Co. v. Beck*, 624 P.2d 790, 793–94 (Alaska 1981). While evidence of subsequent remedial measures is inadmissible to prove negligence, Rule 407 does · not apply this exclusionary rule to strict liability cases. The official commentary to Rule 407 states:

> The reasons mentioned above for the general [exclusionary] rule do not apply in a products liability case because,
>
>> [T]he focus of attention in strict liability cases is not on the conduct of the defendant, but rather on the existence of the defective product which causes injuries. Liability is attached, as a matter of policy, on the basis of the existence of a defect rather than on the basis of the defendant's negligent conduct. . . .
>
> *Bachner v. Pearson*, 479 P.2d 319, 329 (Alaska 1970).
>
> Evidence of subsequent repairs or improvements may be highly probative as to the existence of a defect in a product at the time of an accident.

In this case, Charley Amant, plant manager of the Electro-Magic division, testified at a deposition about a company distributors' meeting. Amant stated to the people attending the meeting that "there had been a problem with tanks of this nature. And I asked them, at that time, if they knew of any tanks like this . . . they should take steps to take them out of service." The superior court admitted Amant's statement as evidence of a recall for the purpose of proving defective condition, relying on the commentary to Alaska R. Evidence 407. He also instructed the jury that it could consider the testimony only as evidence of the tank's defective condition, not as evidence of Dura's negligence.

██ On appeal, Dura claims that Amant's testimony was improperly admitted because his statement did not describe with particularity any specific defect. Furthermore, the testimony's prejudicial impact outweighed any probative value. However, Amant made the recall announcement after Dura knew that Harned had filed this action for personal injuries. From the context, it seems that Amant was referring to the tank's explosion and therefore his testimony could be deemed relevant. In addition, the court's limiting instruction to the jury eliminated some of the risk of prejudice to Dura. Under these circumstances, we find no abuse of discretion in the admission of evidence of Dura's recall.[9]

### IV. DAMAGES

Dura claims that the superior court should have granted remittitur because of duplication in the assessment of damages for the value of non-market services and for loss of enjoyment of life. Harned's economist, Dr. Finch, testified that it would

---

**9.** Dura also claims that Harned's counsel made improper comments during closing argument. First, Harned referred to Dura as a "big corpo- ‹ ration" in violation of the court's order prohibiting Harned from referring to Dura's financial strength or size. Second, Harned stated: "I think the industry needs to be given a message. . . . Alaska is not a dumping ground for this sort of stuff." Dura objected at trial that this argument related to punitive damages, which were not at issue. Because of Harned's statements, Dura claims the trial court should have granted its motion for a new trial.

We find that the statements of Harned's counsel do not constitute reversible error. Taken in context, the "big corporation" remark referred to Dura's ability to contest Harned's methodology in estimating damages, not to Dura's financial strength. Second, Harned did not pursue his "dumping ground" line of argument after Dura objected. *See Beaumaster v. Crandall*, 576 P.2d 988, 995 (Alaska 1978).

take Harned an extra 2½ hours per day to perform household chores such as mowing the lawn, shoveling snow, shopping, or doing dishes. Finch calculated the value of these non-market services at $352,394. In closing argument, Harned's counsel also sought damages for loss of enjoyment of life. He claimed that it took Harned much longer to shower, dress and perform household chores due to his disability. Dura contends that damages claimed for non-market services were duplicated in the claim for loss of enjoyment of life.

We reject Dura's argument. The jury was specifically instructed that arguments of counsel are not evidence in the trial. In addition, Harned introduced sufficient evidence during the trial to support a separate award for loss of enjoyment of life. Before his injury, Harned was involved in outdoor activities such as fishing and hunting, and sports such as water skiing. He was described as an outgoing and sociable man. After his injury, Harned has experienced difficulty participating in sports. For example, he nearly drowned while water skiing when his prosthetic hook got caught in a tow rope. He has also become withdrawn from his friends and family. Based on the evidence, the jury could have reasonably awarded damages for non-market services in addition to loss of enjoyment of life in accordance with the jury instructions on compensatory damages.

We will not set aside a jury verdict on damages unless it strikes us as manifestly unjust. *Fruit v. Schreiner*, 502 P.2d 133, 145 (Alaska 1972). In reviewing the record to determine whether the evidence is legally sufficient to support the verdict, we view "the evidence and all inferences reasonably

**10.** Alaska R.Civ.P. 82(a) provides:

(a) Allowance to Prevailing Party.
    (1) Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any money judgment therein:

deductible therefrom in the light most favorable" to Harned. *City of Fairbanks v. Smith*, 525 P.2d 1095, 1096 (Alaska 1974). Based on this review, we cannot say that the evidence supporting the verdict was insufficient. *Grasle Electric Co. v. Clark*, 525 P.2d 1081, 1089 (Alaska 1974).

## V. ATTORNEY'S FEES

The superior court awarded attorney's fees totalling $348,264 to Harned as the prevailing party, calculated pursuant to the Civil Rule 82(a)(1) schedule.[10] Dura claims that the court abused its discretion by awarding attorney's fees to Harned.

The award of attorney's fees to the prevailing party is committed to the discretion of the trial court. *Palfy v. Rice*, 473 P.2d 606, 613 (Alaska 1970). We will interfere only upon a clear showing of abuse of the trial court's discretion, "where it appears that the court's determination is manifestly unreasonable." *Adoption of V.M.C.*, 528 P.2d 788, 795 (Alaska 1974).

In this case, the court relied on the Civil Rule 82(a)(1) schedule to award attorney's fees. Harned has pursued this action through two extensive and complicated trials and one appeal. We do not believe that the trial court's adherence to the rule's schedule was manifestly unreasonable. *Municipality of Anchorage v. Sisters of Providence*, 628 P.2d 22, 35 (Alaska 1981).

The decision of the superior court is AFFIRMED.

ATTORNEY'S FEES IN AVERAGE CASES

| | Contested | Without Trial | Non-Contested |
|---|---|---|---|
| First $2,000 | 25% | 20% | 15% |
| Next $3,000 | 20% | 15% | 12.5% |
| Next $5,000 | 15% | 12.5% | 10% |
| Over $10,000 | 10% | 7.5% | 5% |

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court in its discretion in a reasonable amount.